251 Miss. 750 (1965)
171 So.2d 347
MARSHALL, et al.
v.
MAYOR AND BOARD OF SELECTMEN OF THE CITY OF McCOMB CITY, MISSISSIPPI
No. 43276.
Supreme Court of Mississippi.
February 1, 1965.
*752 Jack H. Young, Carsie H. Hall, Jackson; Robert L. Carter, Maria L. Marcus, Barbara A. Morris, New York City, for appellants.
*753 William A. Wiltshire, Louis Alford, McComb, for appellee.
*754 ETHRIDGE, J.
The Mayor and Board of Selectmen of the City of McComb City, Mississippi adopted an ordinance to contract the corporate boundaries, by excluding and detaching certain parts of territory incorporated in 1961. As required by statute, they filed a petition with the Chancery Court of Pike County for approval of such contraction. Thomas J. Marshall and others, appellants, filed objections, and after a hearing the trial court entered a decree finding that the proposed detachment was reasonable, and was required by the public convenience and necessity. The pertinent statutes make these the criteria for an enlargement or contraction of city limits. Miss. Code Ann. § 3374-10 to 3374-13 (1956). *755 The questions here are (1) whether this finding is supported by the evidence, and (2) whether the contraction was based on racial discrimination and thus is violative of the fourteenth and fifteenth amendments to the United States Constitution. We answer (1) in the affirmative, and (2) in the negative, and affirm the decree.
(Hn 1) Essentially, extension or contraction of municipal boundaries is a legislative action, reviewable by the courts under certain tests but delegated by the legislature to the municipal governing authorities. In contrast with the general requirements of the Mississippi act, many other states, in providing for detachment of a territory from a municipality, prescribe certain facts or conditions which must exist in order to authorize detachment. 2 McQuillin, Municipal Corporations § 7.27 (1949); 62 C.J.S. Municipal Corporations § 48(b) (1949).

I.
The City of McComb City, situated in Pike County, has a population according to the 1960 census of 12,000. In April 1961, it expended its municipal boundaries by adding 1150 acres on its south and southwest sides. The ordinance, passed in September 1960, stated that the city proposed to furnish water and sewage facilities within the added territory, when required by its occupants, and fire and police protection, garbage collection, school facilities, and other municipal facilities "now being furnished to occupants of property within the corporate limits." This expansion was approved in April 1961.
In August 1963 the city by ordinance contracted the municipal boundaries by detaching a portion of the new territory, added in 1961, removing from it approximately 350 acres on the extreme south side of the added territory, south of Highways 24 and 98. The ordinance stated:

*756 The City of McComb City proposes to contract the City limits as herein proposed because it has become evident that the facilities offered the residents of this excluded area cannot be furnished within a reasonable time as was indicated when this area was incorporated within the City, April 29, 1961. That if the said City attempted to provide water and sewer facilities in addition to fire, police protection, garbage collection, and other municipal facilities, all of the citizens of the City would be unduly burdened, and that public convenience and necessity is required and would be served by the contraction of the City limits as proposed herein.
After the city filed its petition for approval of the contraction, appellants, Thomas J. Marshall and forty-five others, objected. They denied that McComb could not furnish within a reasonable time the facilities described in the 1961 ordinance, and that public convenience and necessity would be served by the contraction. They made these claims: They had a vested interest in the city, because they had been paying taxes since the incorporation. The proposed contraction was discriminatory, since "most of the residents" proposed to be detached were Negroes, and most of the others who were incorporated but remained in the city are white. It discriminated against appellants, who are Negroes, because of their race, contrary to the equal protection and due process clauses of the fourteenth amendment, United States Constitution. Some of the objectors at great expense had made improvements to their properties in anticipation of eventually receiving all city services. Police protection and zoning regulations would be withdrawn from them, they would be without sewage and sanitation facilities, and would be deprived of effective participation in municipal affairs of the city, in violation of the fifteenth amendment.
*757 The chancery court found that it would take a bond issue of $454,000 to bring city facilities, such as water and sewerage into this area. The city received only $3400 a year in taxes out of this 350-acre area. The ordinance was reasonable and required by the public convenience and necessity. The governing authorities of a city have the duty to consider the welfare of all of its citizens, and the evidence showed that it "cannot extend water and sewage to the area in question without jeopardizing the duty and obligations the city owes to other areas of the city which have been part of the city for many years."
The trial court said that, although an attempt had been made to inject the race issue, "the proof shows there is no foundation for that attempt. My decision would be the same regardless of who the objectors may have been." The objections filed by appellants "were not supported by the evidence and should be overruled." The detached area will not suffer any unreasonable or substantial loss, will be provided adequate police and fire protection by the sheriff's office, and the school children will not be affected. The detached area is not needed for expansion, and is not in the path of expansion. The city does not have the financial resources for expenditures of $454,000 and will not have them in the foreseeable future. Providing the facilities in the excluded area would be more expensive than in other parts of the city containing a like amount of area. They cannot be provided in the foreseeable future without unduly burdening all of the inhabitants of the municipality. Hence the decree approved the ordinance.
(Hn 2) The virtually uncontradicted evidence offered by appellee supports the finding of the trial court that the detachment of the 350-acre tract was reasonable and was required by the public convenience and necessity. The objectors failed to offer any tangible evidence that the city was either motivated by racial considerations *758 or that it in fact acted for reasons of race. The evidence not only fails to support but contradicts this argument made by appellants.
Gordon Burt, Jr. had been mayor of McComb since January 1963. Before enactment of the ordinance, he and the board of selectmen studied the matter for six months. The city engineer, J.E. Carruth, was directed to make cost estimates for extending full city facilities to the detached area. After this study, the mayor and board concluded that the financial condition of the city and the projected cost prevented extension of city facilities to this area within the foreseeable future. The north boundary follows the natural physical boundaries of the streets as lines of demarcation. The detached area is not needed for growth of the city. Other areas are available and needed for growth. The city has been expanding in a westerly direction, not south, and it is ample for future expansion.
Of the 350 acres, the city owns 50 acres, containing a sewage lagoon. The McComb Separate School District has 20 acres upon which a school was located before the 1961 annexation, and to which the district built a water line before 1961. In the west portion and the extreme south edge, there is additional open land, aggregating 70 to 80 acres. The city can extend full services to those remaining in the city after detachment without substantial cost. The detachment will not interfere with school children participating in schools of the separate school district. No changes would be made, except that when children are outside of the city limits they are entitled to bus transportation to school, if over one mile away. The mayor said that the only question considered was the economic feasibility of extending municipal services to the detached area. The city would continue to furnish fire protection to it. Before annexation, law enforcement by the sheriff was adequate.
*759 The city does not have financial resources, the mayor said, to spend on the detached area. It is under an obligation to make improvements where there is a definite expansion. Provision of water and sewerage would be difficult and expensive, because construction of long pipelines to serve a few people would be uneconomical, and the elevation of the land would render sewage pipes disproportionately expensive. In the preceding year the detached area produced only $3400 in taxes. It contains persons of both races. The annexed part remaining in the city contains 119 Negro property owners and 103 white property owners. The area known as Algiers, to be retained, is predominantly Negro. Part of the detached land is predominantly white. The mayor and board concluded that within a reasonable time the city could not supply the tract with facilities. The detachment does not withdraw any sewer or water services, because they are not now being rendered. It will not affect any zoning ordinance, since it has not been enforced in this area. The millage rate of the city was reduced from 47 to 37 mills, because the electorate voted to impose a sales tax of 1/2%, which replaced the reduction in ad valorem millage.
In the middle 1950's, the city issued bonds of $850,000. As of September 1963, $723,000 were outstanding. Annual retirement payments on them increase every year by $2,000, and with 21 more years for amortization they have become a serious burden upon the city. Increased payments were based upon an anticipated increase in revenue, but that has not developed. In 1960 the city issued bonds of $150,000 to construct a sewage lagoon in the southwest part of the area in question. The engineering estimate of the cost to provide water and sewage facilities for the detached area is $454,000. The city has never spent that amount of money on so small an area. It would put an undue burden upon other citizens, since the area remaining after detachment will *760 require all available revenue. The 1961 expansion was not recommended by the city planning board.
The separated area has some graveled streets, and some parts of it are fairly thickly populated. The homes there use either septic tanks or sanitary closets for sewage. The city's water and sewer department was operating at a deficit when Burt assumed office in 1963. Part of the detached area is called "Beartown," a large majority of whose residents are Negro, but there are also many white residents. The Algiers district, not adjacent to the detached area, is predominantly Negro, and if the city had been drawing lines on a racial basis, it could have been detached without affecting the symmetry of municipal boundaries of the city, but that was not done. The streets in the detached tract were built by the county, before the 1961 annexation, and were maintained by the county. R.R. Warren, Sheriff of Pike County, testified that if the area was detached, his office would provide it with adequate law enforcement.
A petition with 111 signatures was filed with the mayor and board by persons living in the detached area, requesting removal from the city limits. M.J. Statham said that he circulated the petition for only a few hours, obtained the signatures with no difficulty, and around 60% of them were Negro.
J.E. Carruth, city engineer, designed and supervised construction of McComb's sewer and water systems. He estimated the cost of providing sewer, water and street facilities for the detached area would be $454,000. It has practically none at present. Its topography greatly increases the cost of sewage lines, because a ridge through it divides the drainage between west and east. Elevated water storage would also be needed. All of this would require at least two pumping stations for sewage disposal, in order to serve the east side of the ridge. Sewage would have to be pumped under the railroad to *761 flow into the existing disposal plant. A complete reconstruction job would be necessary for the streets. Moreover, there are several districts within the old corporate limits which do not have but need sewerage and water. There has been a recent extension of the city limits to the north, where there are both colored and white residential areas without city facilities. Several subdivisions are being developed within the old city limits.
Four witnesses testified for objectors. They resided in the detached area, and were Negroes. They said they wanted to remain in the city limits, and were willing to wait for full municipal services until such time as the city could afford them. They thought remaining in the city would furnish better police protection and streets, and garbage collection. At the present they are not receiving city water and sewage facilities. They objected to being moved from the city also because they could not vote in municipal elections. It was stipulated that thirteen other persons would testify substantially in the same way. Although counsel for appellants stated on the argument that there were 2500 residents in "Beartown," which is in the detached area, the record is silent as to its population.

II.
The evidence offered by the city in support of the proposed detachment is virtually uncontradicted. The questions are whether there is any reasonable basis for the ordinance, and whether the evidence reflects public convenience and necessity. We answer both in the affirmative. The contraction is essentially a legislative function, but subject to judicial review on these issues. Dodd v. Jackson, 238 Miss. 372, 118 So.2d 319 (1960); In re City of Philadelphia, 232 Miss. 582, 100 So.2d 100 (1958).
*762 In summary, the ordinance to detach this land was based upon certain undisputed facts: The area is difficult to service with water and sewerage, because of topography and other physical characteristics. It cannot be developed without making the balance of the city suffer, and is not needed for future expansion. The city is financially unable to comply with the 1961 ordinance expanding the city limits and taking in the detached area. To develop it would financially overburden McComb. The symmetry of the city boundaries are not disturbed by the new line. Moreover, expansion of McComb is to the west and north, not south, and demands for services are principally in those other areas. The city provided no water and sewer service to the detached land during the two years it was in the city limits. No zoning regulations were applied in that interim to the area, which would be left in the same condition as it was when taken into the city. The detachment would not result in loss of police or fire protection, nor would unsanitary conditions arise because of the detachment. School children would not be affected. Existing streets were built by the county. These and the other substantially undisputed facts in the record support the decree upholding the ordinance.
(Hns. 3, 4) The other two detachment cases from this jurisdiction upheld the validity of ordinances excluding certain territory. Wheat v. Town of Poplarville, 149 Miss. 424, 115 So. 559 (1928); Thomas v. Town of Long Beach, 111 Miss. 329, 71 So. 570 (1916). The severance of land from municipal corporations depends largely upon the provisions of the statute in its application, taking into consideration the location and characteristics of both the municipality and the land. It comprehends the symmetry of the city, the difficulties of administration, economic problems, and planning improvements. 2 McQuillin, Municipal Corporations § 7.27 (3d ed. 1949). And the fact that land sought to be detached may have *763 received benefits from a municipality does not bar its detachment. Van Bebber v. Village of Scottville, 13 Ill. App.2d 458, 142 N.E.2d 711 (1957); 1 Yokley, Municipal Corporations § 35 (1956). Where a certain area in a town has no proper relationship to its future growth, and receives no substantial benefits, its detachment may become proper. Town of Medley v. Seminole Rock Products, Inc., 138 So.2d 534 (Fla. App. 1962); Howard v. North Salt Lake, 7 Utah 2d 278, 323 P.2d 261 (1958).
(Hn 5) Some of the criteria available for city authorities in determining whether to detach territory, particularly if the same has recently been added to it, arise where no improvements have been made by the municipality, the symmetry of the city will not be marred by the detachment, and extending full city services to the area would place upon the municipality an economic burden wholly out of proportion to the needs of the citizens of the city as a whole, and not commensurate with the economic resources and revenue of the municipality. 37 Am. Jur. Municipal Corporations §§ 35-39 (1941); 62 C.J.S. Municipal Corporations § 48 (1949); Annot., 117 A.L.R. 271 (1938).
(Hn 6) Moreover, where the right to a severance of territory from a municipal corporation is a continuing one, estoppel may not be asserted as a defense to it. 62 C.J.S. Municipal Corporations § 48(c); Annot., 101 A.L.R. 581 (1936). Apparently the 1961 extension of the municipal limits into the detached 350 acres was the result of a mistake made by the mayor and board of selectmen at that time, and the present ordinance is an attempt to rectify that error. Where the corporate limits of a city have been unreasonably extended, a part of the territory may be detached. Wheat v. Poplarville, 149 Miss. 424, 115 So. 559 (1928); Thomas v. Long Beach, 111 Miss. 329, 71 So. 570 (1916); Annot., 62 A.L.R. 1011, 1033 (1929).
*764 In short, the facts reflect a rational basis for the decision of the mayor and board. Whether the contraction is a wise step, and whether it supports the best, long-term interests of McComb are not judicial questions, but issues for the governing authorities of that city.

III.
(Hns. 7, 8) Appellants also assert that since they were in the municipal limits for about two years, they have now acquired a "vested interest in the city," and to now take that from them would be to deprive them of property without due process of law, contrary to the equal protection and due process clauses of the fourteenth amendment, United States Constitution. If this contention were valid, a city could never contract its limits, although it had not extended any substantial municipal facilities to the area and was financially unable to service the new territory, without disregarding the interests of all of its other inhabitants. Where reasonable and required by public convenience and necessity, the right to a severance of territory from a municipal corporation is a continuing right, and estoppel may not be asserted as a defense to it. 62 C.J.S. Municipal Corporations § 48(c) (1949); Annot., 101 A.L.R. 581 (1936).
Appellants further claim that the contraction discriminates against them because of their race, contrary to the equal protection clause of the fourteenth amendment; and that it deprives them of the right to vote because they are Negroes, in violation of the fifteenth amendment to the Constitution of the United States. The record does not support these arguments. It fails to show that the mayor and board of selectmen were either motivated by racial consideration or in fact detached the territory on racial lines or for those reasons. The evidence reflects that the city authorities concluded they made a mistake in extending the city limits two years before; that the city with a heavy bonded indebtedness *765 was not able to extend municipal services to this 350-acre tract, because its topography and the distances involved required unusually expensive extensions to a limited area, contrary to the best interests of other citizens of the city.
Gomillion v. Lightfoot is not applicable. 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). That case was decided on the basis of allegations in a complaint. The Alabama Legislature altered the shape of the City of Tuskegee from a square to a 28-sided figure, and removed from the city all save a few Negro voters, but no white voters. It was held that on its face the statute was invalid because it violated the fifteenth amendment, which prohibits a state from passing any law depriving a citizen of his vote because of his race. Here the mayor and board of selectmen received a petition from 111 residents of the detached area, requesting detachment. Sixty percent of them were Negroes. A majority of those remaining in the 1961 annexed territory, after the detachment, are Negroes. Adjacent areas, such as Algiers, which are principally Negro remained in the municipality. These and other facts negative appellants' assertions of racial discrimination. Moreover, appellants did not offer any other evidence of a different nature to show discrimination because of race, or any motivation to exclude Negroes as voters.
Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), upheld a New York statute apportioning congressional districts lying in New York County. The Court affirmed the trial court's holding that the districts were not the product of a state contrivance to discriminate against colored voters; and that plaintiffs failed to prove the legislature was either motivated by racial considerations or in fact drew districts on racial lines. In the instant case, as in Wright, the crucial factual issues fail to support the contentions of *766 appellants. See Taylor v. Township of Dearborn, 370 Mich. 47, 120 N.W.2d 737 (1963).
Affirmed.
Lee, C.J., and Brady, Patterson and Inzer, JJ., concur.