# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-CA-01419-SCT

*THE MATTER OF THE EXTENSION*

*OF THE BOUNDARIES OF THE*

*CITY OF BATESVILLE, PANOLA*

*COUNTY, MISSISSIPPI: COMMITTEE OPPOSED TO ANNEXATION*
*v.*
*CITY OF BATESVILLE*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/27/1997 |
| TRIAL JUDGE: | HON. PERCY L. LYNCHARD, JR. |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | GUY T. GILLESPIE, III |
| ATTORNEY FOR APPELLEE: | COLMON S. MITCHELL |
| NATURE OF THE CASE: | CIVIL - MUNICIPAL BOUNDARIES & ANNEXATION |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 03/16/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/6/2000 |

## EN BANC.

## WALLER, JUSTICE, FOR THE COURT:

¶1. This municipal annexation case is an appeal from the Chancery Court of the Second Judicial District of Panola County. Finding that the Chancellor erred in approving all of the admittedly aggressive annexation at issue, we reverse in part and affirm in part the proposed annexation.

## STATEMENT OF THE FACTS

¶2. The City of Batesville is a municipality located just south of the Tallahatchie River in Panola County at the confluence of Mississippi Highways 6 and 35 and U. S. Highway 51. At the time of the proposed annexation, Batesville had a population of more than 7,000 people. When the annexation petition was filed, the easternmost city limits were generally delineated by Interstate Highway 55, except for two tracts east of I-55: an Industrial/Commercial development at the intersection of Highway 35 North and I-55, and a

narrow corridor along Highway 6 East. These two parcels of land were the subject of the most recent annexations prior to the annexation at issue. The Industrial Park area was annexed in 1979, along with several other tracts of land to add some 1,500 residents to the city. The Highway 6 corridor was annexed in 1988, adding just over 200 residents. At the time of the annexation sub judice, Batesville encompassed 11.8 square miles, or 7,552 acres. The annexation would enlarge Batesville by 11,667 acres or 18.23 square miles, and would increase the population by over 800 residents.

¶3. Of the proposed annexation area, the Chancellor refused to allow Batesville to annex 2,140 acres or 3.34 square miles, which ruling Batesville has not appealed.[1] On the other hand, the Committee Opposed to Annexation ("the COA") is not objecting to the annexation of 4,800 acres or 7.5 square miles. The disputed areas which are the subject of this appeal are two parcels of land which are mostly residential and agricultural and consist of 4,467 acres of land or 7 square miles. Thus, even excluding the areas of dispute in this appeal, Batesville's metropolitan area has been increased from 11.8 square miles to 18.8 square miles. A map depicting the City of Batesville and the areas that are the subject of this appeal is set out as Appendix "A."

## STATEMENT OF THE CASE

¶4. The only issue before the Chancellor was whether the proposed annexation was reasonable.[2] *See City of Jackson v. Town of Flowood*, 331 So. 2d 909, 911 (Miss. 1976); *Ritchie v. City of Brookhaven*, 217 Miss. 860, 870-873, 878, 65 So. 2d 436, 439-40 (1953). The annexation trial lasted over four days, often going late into the evening, involved hundreds of exhibits, and culminated in a tour by the Chancellor of the proposed annexation area with each side pointing out the areas that supported their respective positions.

¶5. On August 29, 1997, the Chancellor found that the proposed annexation was reasonable and confirmed the extension of Batesville's boundaries with some exceptions.[3] The Chancellor also excluded some of the proposed areas of annexation that are not at issue since Batesville did not cross-appeal.

¶6. The COA opposes annexation only in the two areas in which the 127 members of the COA reside: the "Brewer Road Area" (a rectangular tract of land comprising all of Section 2 and parts of Sections 1 and 3, Township 9 South, Range 7 West, along with a parcel located on Harmon Road in Section 36, Township 8 South, Range 7 West, and the "E ½-Corridor 6 South Area" (a tract of land comprised of a small parcel of land north of Highway 6 East, and a large area south of Highway 6 East, found within Sections 7, 8, 17, 18, 19, and 20 of Township 9 South, Range 6 West, and Sections 12, 13 and 24 of Township 9 South, Range 7 West, and consisting of the Cotton Plant Road, Good Hope Road, and Mount Olivet Road areas, which generally lie in the eastern half of the southern portion of the Corridor 6 area). There are two issues raised by the COA in this case:

**I. WHETHER THE CHANCELLOR ERRED IN GRANTING THE CITY OF BATESVILLE'S PETITION FOR ANNEXATION, OR WHETHER THE CHANCELLOR COMMITTED MANIFEST ERROR IN FINDING THE ANNEXATION REASONABLE.**

**II. WHETHER A LESS DEFERENTIAL STANDARD OF REVIEW SHOULD BE APPLIED TO A CHANCELLOR'S FINDINGS IN AN ANNEXATION CASE.**

## STANDARD OF REVIEW

¶7. We may reverse a Chancellor's determination that an annexation is either reasonable or unreasonable only if that decision is manifestly erroneous or is unsupported by substantial credible evidence. *In Re the Enlargement and Extension of the Municipal Boundaries of the City of Biloxi*, 744 So. 2d 270, 277 (Miss. 1999) (citing *McElhaney v. City of Horn Lake*, 501 So. 2d 401, 403 (Miss.1987); *Extension of Boundaries of City of Moss Point v. Sherman*, 492 So. 2d 289, 290 (Miss.1986); *Enlargement of Boundaries of Yazoo City v. City of Yazoo City*, 452 So. 2d 837, 838 (Miss.1984); *Extension of Boundaries of City of Clinton*, 450 So. 2d 85, 89 (Miss.1984)). "Where there is conflicting, credible evidence, we defer to the findings below." *Bassett v. Town of Taylorsville*, 542 So. 2d 918, 921 (Miss.1989). "Findings of fact made in the context of conflicting, credible evidence may not be disturbed unless this Court can say that from all the evidence that such findings are manifestly wrong, given the weight of the evidence." *Bassett*, 542 So. 2d at 921. "We only reverse where the Chancery Court has employed erroneous legal standards or where we are left with a firm and definite conviction that a mistake has been made." *Id.,* cited in *City of Biloxi*, 744 So. 2d at 277.

**DISCUSSION**

### I. WHETHER THE CHANCELLOR ERRED IN GRANTING THE CITY OF BATESVILLE'S PETITION FOR ANNEXATION, OR WHETHER THE CHANCELLOR COMMITTED MANIFEST ERROR IN FINDING THE ANNEXATION REASONABLE.

¶8. In *City of Biloxi*, this Court unequivocally stated the standards by which a Chancellor must judge the reasonableness *vel non* of a city's proposed annexation:

> The outcome determinative question of ultimate fact before the chancery court is the reasonableness of the proposed annexation. Over the years our case law has developed a number of factors that should be considered in this context. Before listing them, it should be emphasized that these factors are but indicia of reasonableness and not separate or distinct tests in and of themselves. *Bassett,* 542 So. 2d at 921.

> In a series of cases beginning with *Dodd*, 238 Miss. at 396-97, 118 So. 2d at 330, including *McElhaney,* 501 So. 2d at 403-04, and *City of Greenville v. Farmers, Inc.*, 513 So. 2d 932, 941 (Miss.1987), this Court has recognized at least eight indicia of reasonableness. These are (1) the municipality's need for expansion, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) the potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised, (5) the need for zoning and overall planning in the area, (6) the need for municipal services in the area sought to be annexed, (7) whether there are natural barriers between the city and the [proposed annexation area], and (8) the past performance and time element involved in the city's provision of services to its present residents.

> Other judicially recognized indicia of reasonableness include (9) the impact (economic or otherwise) of the annexation upon those who live in or own property in the area proposed for annexation; *Western Line*, 465 So. 2d at 1059; (10) the impact of the annexation upon the voting strength of protected minority groups, *Yazoo City*, 452 So. 2d at 842-43; (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and for the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy the (economic and social) benefits of proximity to the municipality without paying their fair share

of the taxes, *Texas Gas Transmission Corp. v. City of Greenville*, 242 So. 2d 686, 689 (Miss.1971); *Forbes v. City of Meridian*, 86 Miss. 243, 38 So. 676 (1905); and (12) any other factors that may suggest reasonableness vel non. *Bassett*, 542 So. 2d at 921. More recent cases have also relied upon these twelve factors. *In re Enlargement & Extension of the Mun. Boundaries of the City of Madison, Mississippi: The City of Jackson, Mississippi v. City of Madison*, 650 So. 2d 490 (Miss.1995) (hereinafter, "*Madison*"); *In re Extension of the Boundaries of the City of Columbus*, 644 So. 2d 1168 (Miss. 1994) (hereinafter "*Columbus*").

The chancellor must consider all of these factors and determine whether under the totality of the circumstances the annexation is reasonable. *Id.* at 921-22; *In the Matter of the Extension of the Boundaries of the City of Vicksburg*, 560 So. 2d 713, 716 (Miss.1990); *In re Enlargement of Corporate Boundaries of the City of Booneville v. City of Booneville*, 551 So. 2d 890, 892 (Miss.1989); *In the Matter of the Extension of the Boundaries of the City of Jackson*, 551 So. 2d 861, 864 (Miss.1989).

[*City of Biloxi*, 744 So. 2d at 276-78](#).

### 1. Batesville's Need for Expansion

¶9. The Chancellor found that Batesville had evidenced a need to expand. Specifically, the court looked to the residential, commercial, and industrial development occurring along Highway 35, Brewer Road, Highway 6, Sherwood Forest Estates (which already had been furnished municipal services), Good Hope Road, Cotton Plant Road, Trantham Road, and the Fox Meadows subdivision. The Chancellor also took notice of the small percentage of developable land available within the current city limits.

¶10. Batesville supported its claim that expansion was needed by pointing out the upward trend of the population growth within the city (673 persons over the last 7 years) and the annexation area and the issuance of new building permits within the city (275 permits over the last 7 years, including 9 permits for the construction of public buildings and one large retail outlet mall). Batesville also offered proof that by 1997 only 21% of the land currently existing in the city was vacant and had development potential. Its expert testified that when a city reaches a 60% level of development, annexation was needed to meet the growth trend, and Batesville had already reached a 79% level of development.

¶11. The COA argues that the relevant question is not whether Batesville needs to expand, but *how much* it needs to expand. Even the Chancellor opined that this expansion was "admittedly aggressive," as Batesville is seeking to add some twenty square miles, which would more than double its current size. The COA contends that the Chancellor should have quantified Batesville's need and provided for only a moderate expansion in keeping with its proven need to expand.

¶12. The COA points out that Batesville did not introduce any population density or annual acreage development studies. It also demonstrates that Batesville has expanded by about 155 acres per year for the past 3 years, and, that if this rate of expansion remains constant, it would take 12 years to develop all of the available land within the current city limits.

¶13. The COA points out that testimony at trial showed that there was developable residential land available within the current city limits and the undisputed annexation areas, and that there is little room for residential, commercial, or industrial development in the areas that are disputed, as most of those areas have

already been developed and serve as residential and agricultural development.

¶14. We are not persuaded that the city has demonstrated a need for such an expansive annexation *in toto*. The uncontested annexation area consists of 4,800 acres of land, or 7.5 square miles, which would represent almost 40% of Batesville's incorporated limits after annexation.[(4)] The undisputed area is ripe for annexation; it contains virtually undeveloped land, and many property owners there favor the annexation. In fact, plans are currently being made for a new hospital and other residential, commercial, and industrial developments. Batesville has annexed this territory at a crucial time to ensure orderly development.

¶15. Batesville has also demonstrated a need to expand into the disputed Brewer Road area, which is approximately 1,400 acres or 2.2 square miles. Testimony at trial revealed that the Brewer Road Area was essential to the annexation. Brewer Road is a vital line of communication, as it is one of only four routes that will link the older part of Batesville west of I-55 to the new annexed areas east of I-55. Along this road, residents are provided municipal water services, and sewer and gas improvements are planned. Extension of these utilities will provide services, not only for the Brewer Road Area, but for the uncontested annexation areas to the immediate north and south of the Brewer Road Area, including the Bethlehem Road Area and the Corridor 6 North Area. A review of the Appendix "A" map reveals that it would be illogical to leave the Brewer Road area out of the annexation in light of the newly annexed areas immediately adjacent to the north and south. Allowing annexation of the Brewer Road Area will also give Batesville a somewhat contiguous eastern boundary. This Court has considered the need for access to other areas as a factor for determining the reasonableness of annexation of a particular tract of land; otherwise, there would be a hole in the city after annexation. *See **City of Greenville v. Farmers, Inc.***, 513 So. 2d 932 (Miss. 1987). The Brewer Road Area and the uncontested areas add 6,200 acres or 9.7 square miles to Batesville's current 11.8 square miles, and provide ample opportunities for growth and development. In conclusion, this factor tends to weigh against the reasonableness of the annexation for the E ½-Corridor 6 South Area, but in favor of annexation of the disputed Brewer Road Area.

### 2. Path of Batesville's Growth

¶16. The Chancellor concluded that "[i]t is doubtful that reasonable minds can differ that the proposed area of annexation is within the path of growth of the city." In fact, undisputed evidence shows that Batesville's development has predominantly moved towards the east, where the current disputed areas of annexation lie. The Chancellor's decision related to the path of growth is not manifestly erroneous. Nevertheless, it should be noted that Batesville's current undisputed boundaries do not extend as far east as the E ½-Corridor 6 South Area, while they do encompass the areas just north and south of the Brewer Road Area.

¶17. In determining whether a proposed annexation area is within the path of growth of a city, we consider whether the proposed annexation area is adjacent to the city, accessible by public streets, roads, and highways, and has a common community of interest with the city. In the present case, the Brewer Road Area fulfills these criteria, but the E ½-Corridor 6 South Area is still comparatively remote from the other annexed areas. Therefore, this factor also tends to favor a modification of the annexation to include the Brewer Road Area, but to exclude the E ½-Corridor 6 South Area.

### 3. Potential Health Hazards from Sewage and Waste Disposal

¶18. The Chancellor concluded that the improper discharge of sewer and waste in the proposed annexation area created a potential health hazard and militated in favor of annexation. He also concluded that municipal

enforcement of litter and trash disposal and regular trash collection would prohibit the illegal or improper disposal of solid waste materials.

¶19. The COA concedes that a municipal, central sewer system and waste treatment facility would be better than the septic tanks and private treatment plants currently in use. On the other hand, some of the residents in the disputed areas have spent significant sums of money for their private sewage systems. Indeed, Batesville's expert testified that sewer services would not need to be extended into those locations, including Fox Meadows, because those residents have demonstrated adequate upkeep of their private sewage systems. The COA acknowledges that a central sewer system would be more desirable, but it contends that the current system is effective. In addition, Batesville did not present any evidence of a health problem related to the sewage systems in the proposed annexation area.

¶20. Batesville did, however, show the *potential* for a health problem resulting from the use of defective and malfunctioning septic tanks--a problem present throughout the annexation area--allowing for sewage to seep on top of the ground. Additionally, the soil is apparently not conducive to the use of septic tanks. An employee of the State Department of Environmental Quality who appeared as Batesville's expert testified that, in the annexation area, open dumping of garbage, old vehicles and other large pieces of machinery was practiced, standing water was present due to lack of absorption in the soil, and mosquito control was needed.

¶21. While Batesville made an adequate showing of the desirability of central sewage, it failed to present a comprehensive plan for preventing these potential health hazards within a reasonable amount of time.

### 4. Batesville's Financial Ability to Make Improvements and Furnish Municipal Services

¶22. The Chancellor concluded, "Based upon the testimony of the witnesses, and examination of the budgets and other financial data presented, there is little doubt that the municipality is financially able to make the improvements and furnish municipal services outlined in their plan for the proposed annexation area."

¶23. The COA contends that implementation of the sewer and water improvement plans would not provide all of the outlined services within a reasonable 5 year period. *See City of Columbus*, 644 So. 2d at 1182; *City of Jackson*, 551 So. 2d at 861. Instead, each of these proposals is divided into two phases, the second phase of which is contingent on those secondary services being "necessary and economically feasible." Neither do the plans provide for any specific source of funding for the second phase.

¶24. The COA additionally alleges that Batesville did not provide accurate cost estimates to its accountant, and, as a result, he was unable to testify at trial about the financial feasibility of those phase two costs. Batesville's retained accountant, who testified about Batesville's ability to finance the expansion, was not adequately informed of the costs of the sewage system or the planned hospital commitments. Lastly, Batesville is not planning on purchasing any new equipment or providing any new personnel for its government, court, police department, or public health and sanitation department. Nor does it intend to make any street improvements, or build recreational facilities. In sum, the COA believes that Batesville is financially capable of supporting this annexation only because it will not be improving or extending its services.

¶25. Batesville replies that it has adequate bonding capacity and grants available that, along with tax

collections and other revenues, make this annexation economically feasible. Batesville wishes to extend a full range of municipal services to the proposed annexation area, but makes reference in its brief to those services being provided "where necessary and economically feasible." Batesville's financial advisor testified that Batesville had adequate bonding capacity to finance an expansion. Batesville also emphasizes that it has already incurred considerable expenses in providing services to the proposed annexation area, including a new sewer treatment facility and water, sewer, and natural gas services to the Sherwood Forest Subdivision (not included in the area in dispute on this appeal), and the purchase and improvement of the Humanity Water Association System, which does supply water to the residents of the disputed areas. The financial advisor further testified that Batesville had a good credit history and has always met its financial obligations.

¶26. After a reviewing the record in this case and briefs and hearing oral argument, we are left with real doubts that Batesville will extend all of its municipal services to the residents of the proposed annexation area within a reasonable time. As stated earlier, Batesville has shown that the residents of the proposed annexation area are primarily in need of an adequate central sewer system to eliminate any potential health hazard, yet Batesville has failed to commit to providing such a service within a reasonable time if it is not economically feasible. Given the expense that Batesville will incur in providing municipal services to the undisputed annexation area, and according to the proposed plans for implementation of a new sewer system, there is the distinct possibility that residents in the more remote areas will not receive such services within the first five years. While we find Batesville's desire to extend the full range of municipal services as outlined in the adopted ordinance laudable, we would afford more credibility to its promises if services are extended to the areas approved here for annexation. At this time, however, this Court cannot say with certainty that the residents of the proposed annexation area, especially those in the E ½-Corridor 6 South Area, which is more remote from the current city systems, would, within a reasonable amount of time, see benefits from the payment of city taxes.

### 5. Need for Zoning and Planning

¶27. The Chancellor found:

> Clearly, there is a need for zoning and overall planning in the proposed area of annexation. While Batesville maintains a comprehensive plan to assist in the planning of development, has adopted appropriate zoning ordinances as well as subdivision regulations as well as certain building and licensing codes, the residents of the proposed annexation area have none whatsoever available to them through Panola County.

¶28. The COA maintains that "there is little need for municipal level zoning, overall planning, or municipal service in [a] mostly rural and agricultural area." *In re Exclusion of Certain Territory from the City of Jackson*, 698 So. 2d 490 (Miss. 1997). It does not want or need municipal zoning in the disputed areas. The COA believes that the common law adequately protects it from nuisances created by neighbors, and that there is no need for further regulation. Indeed, freedom from regulation is one of the reasons that its members have moved out of the city limits and into the country.

¶29. Batesville also failed to provide a zoning proposal, although the mayor testified that the zoning would be the current use of the land, which is mostly residential for the disputed areas.

¶30. Batesville cites *Dodd v. City of Jackson*, 238 Miss. 372, 396, 118 So. 2d 319 (1960) for the

proposition that "[t]here is much merit to the theory of overall planning, namely, where it can be reasonably anticipated that a certain area will become a part of the City in reasonable time, it is better to take it in and develop the same properly and wisely." Batesville has extensive zoning and building regulations, designed to keep the residents safe from building violations, and allow orderly development to prohibit incompatible land uses.

¶31. While the Chancellor's findings were not manifestly erroneous at the time of trial, we take judicial notice that Panola County has now adopted land development standards and regulations which serve to give some measurable standards for new development outside Batesville's city limits.[5] Indeed, the regulations provide that any development within a mile of city limits must meet be submitted to the city's governing authority for recommendation prior to the approval for construction by the county. Therefore, residents of the E ½-Corridor 6 South Area would be required to submit plans to Batesville prior to implementation of any new subdivision growth, thereby allowing Batesville a method for controlling development and prohibiting incompatible land uses. Therefore, this factor now weighs against annexation of the E ½-Corridor 6 South Area.

### 6. Need for Municipal Services

¶32. The Chancellor found that the proposed annexation area was in need of animal and mosquito control services, routine trash collection, street lighting, and recreational services and facilities. In addition, annexation would allow for greater fire and police protection for the disputed areas, as well as water and natural gas services.

¶33. The COA shows that it has water services through Humanity before it was purchased by Batesville, and continues to be supplied water through that association. Also, although admittedly not as nice as a connected sewer system, the residents do have sewer services. And, as indicated above, there is no indication that a central sewer system could or would be provided by Batesville. Finally, residents of the disputed areas have protection provided by the Sheriff's office and two county fire districts with volunteer services.

¶34. Batesville documented the need for a connected sewer system. It also asserts that the annexation area residents would, through annexation, have assured police and fire services that are now provided only on a back-up basis. It also asserts that it can provide zoning and planning services which are unavailable through Panola County; however, as noted, even the county residents are now bound by some planning regulations. Batesville maintains that it is capable of providing all of the needed services outlined by the Chancellor.

¶35. The evidence shows that the residents of the proposed annexation area are already provided with the most basic and necessary of the municipal services. They currently have water services, garbage collection through the county, and police and fire protection. There is no substantial, credible evidence that a central connected sewer -- the service that is not provided, but most needed -- would be provided by Batesville within a reasonable time. Therefore, there is little evidence that better municipal services would result if annexation were allowed, particularly for the comparatively remote E ½-Corridor 6 South Area. This factor tends to weigh against the reasonableness of annexation of the E ½-Corridor 6 South Area.

### 7. Natural Barriers between Batesville and Proposed Annexation Area

¶36. While there is no natural barrier between Batesville and the proposed annexation area, I-55 presents

an artificial boundary. With four points of access, however, the interstate is not an impenetrable boundary. This factor does weigh in favor of annexation of the Brewer Road area, since that area is one source of connection between the barrier and Batesville.

### 8. Batesville's Past Performance in Provision of Services to Current Residents

¶37. The Chancellor concluded that, "[w]ith the possible exception of the lack of sewer services available to some residents in past areas of annexation, there is little evidence to suggest that the past performance of the city in providing services to residents is anything short of satisfactory."

¶38. Batesville points out in its brief its history of providing water, sewage, and gas services, as well as resolving street problems, within a reasonable period of time of its last two annexations. The only problem cited by the COA is that less than 2% of the residents (approximately 35) of the last annexation have not been connected to Batesville's sewer system. Batesville should be commended for this record. However, east of I-55, sewer services have been provided only to the Parker-Hannifin Plant because Batesville has not found it economically feasible to extend further the sewer lines on that side of the interstate. Thus, there are several city clients, albeit businesses, located in areas annexed over 18 years ago that still do not have city sewer services. In this case, there are many residential areas that would benefit from a central sewer system, yet Batesville has not promised to provide that service to the more remote disputed areas unless it is economically feasible. Because of the large amount of area allowed for annexation, and the need for development of utilities and consolidation of services, it cannot be said that annexation of the E ½-Corridor 6 South Area is reasonable. This factor weighs against the reasonableness of the annexation for the E ½-Corridor 6 South Area.

### 9. Impact of Annexation on Residents of Proposed Annexation Area

¶39. The Chancellor found that the impact of annexation on the residents of the proposed annexation area could only be positive. Annexation would increase property values, lower insurance premiums, and provide municipal level services to the residents.

¶40. The COA, however, believes that their payment of city taxes will gain them nothing that they deem desirable. The residents may incur additional expense in meeting the Batesville's regulations and restrictions, and they would not have the freedom that they currently enjoy to manage their own affairs and property.

¶41. In *City of Biloxi*, we concluded that even though the

> individual objectors are apparently vehemently opposed to annexation[,] . . . the residents of the [proposed annexation area] will receive something in exchange for their tax dollars. Therefore, although the individual objectors make a strong argument against annexation under this indicium, it is only one indicium of the twelve and is not in and of itself conclusive.

744 So. 2d at 284. In this case, however, it is more difficult to delineate exactly what services or benefits of value that the residents of the proposed annexation area will receive in exchange for their tax dollars. While the Chancellor correctly noted that the residents would receive lower insurance rates, higher property values, and municipal services, we have pointed out the challenge that Batesville faces to provide adequately for the allowed annexation areas, and we are unable to conclude that residents of the E ½-Corridor 6 South Area would be greatly benefitted for their tax dollars.

### 10. Impact of Voting Strength of Minorities

¶42. Neither party raises this factor as an issue, and the Chancellor found that the Fringe Area Study shows that the minority voting strength would be reduced by less than one half of one percent.

### 11. Whether Residents of Proposed Annexation Area Enjoy Municipal Benefits Without Paying their Fair Share of Taxes

¶43. The Chancellor found that the residents of the proposed annexation area received water service, increased fire protection, use of recreational facilities and programs, and municipal gas from Batesville at little or no cost to them. Batesville strengthens those findings by adding that the residents of the disputed areas also have back-up police protection, and receive better insurance rates because of their proximity to the city. In addition, the residents enjoy the shops, churches, and schools located in Batesville without paying the city taxes required by residents within the current city limits.

¶44. The COA counters that those services are not free to them. The county's volunteer units respond to fire calls in the disputed areas; Batesville fire units has responded to only 42 calls since 1990, for which the county pays to Batesville $6,700 annually. Also, Batesville's biggest source of revenue is sales taxes which are payed by residents and non-residents alike. In addition, the water and gas provided to the residents of the proposed annexation area are funded entirely from the fees currently paid by those who use the services, including the non-residents. Lastly, non-residents pay just as much as residents for participation in recreational services. Therefore, this factor weighs against annexation.

### II. WHETHER A LESS DEFERENTIAL STANDARD OF REVIEW SHOULD BE APPLIED TO A CHANCELLOR'S FINDINGS IN AN ANNEXATION CASE.

¶45. The COA includes as part of its argument that the standard of review should be changed. It contends that the Chancellor's decision in annexation cases sometimes amounts to little more than a "rubber stamp" of a city's decision to annex, and that when a Chancellor fails to consider one or more of the indicia, we should be less deferential to the Chancellor's findings on appeal.

¶46. In support of this argument, the COA quotes from Justice Sullivan's dissent describing the framework with which a Chancellor makes his decision regarding annexation in *In re Boundaries of City of Vicksburg*, 560 So. 2d 713, 716-17 (Miss. 1990):

> What will be the yardstick: No one knows. It is not some mystical legal formula discoverable only by judges, steeped in the mysteries of law. It is nothing more than what the chancellor, on a given day, says it is. "Reasonable" is now determined by the length of the chancellor's nose, or foot, if you prefer.

> Then, through the magic of our "manifest error" rule we must affirm the finding of the chancellor. All that is required is that five noses of ours be the same length as the chancellor's. As the trial court is presumed correct, we find infrequently that five noses are of different lengths . . . What must protestors show to avoid being annexed? Who knows? . . . All hope the chancellor's lunch agreed with him.

*See also In re the Enlargement of the Corporate limits and Boundaries of the City of Gulfport*, 627 So. 2d 292, 295 (Miss. 1993) (Smith, J., dissenting) ("the test has been expanded so far that now it is absolutely meaningless.").

¶47. The COA also points to our ruling in the de-annexation case of *In re Exclusion of Certain Territory From the City of Jackson,* 698 So. 2d 490 (Miss. 1997), wherein we held that de-annexation would be allowed where a municipality has failed to extend municipal services within a reasonable period of time. The COA concludes that we have a tendency toward more rigorous review of a Chancellor's decision to allow ambitious territorial expansions where the municipality promises to extend municipal services with only vague references to "economic feasibility." The COA asks that we take a less deferential posture towards Chancellors than the manifest error standard to provide annexation objectors with some real ability to withstand annexation, as the balance is often against those "seeking to fight city hall . . . without any weapons." *See In re Extension of the Boundaries of the City of Columbus*, 644 So. 2d 1168, 1185 (Miss. 1994) (Pittman, J., specially concurring).

¶48. Although this argument has some merit, we conclude that the existing framework for evaluating the reasonableness of annexation is extensive and capable of providing for a fair determination, assuming the Chancellor thoughtfully considers all of the indicia, and we carefully monitor those findings to assure that they are supported by substantial, credible evidence. Therefore, we decline the opportunity to change the burden of proof or the standards of review.

## CONCLUSION

¶49. The Chancellor in this case considered all of the indicia of reasonableness and determined that the annexation proposed by Batesville was reasonable with a few limited exceptions that are not the subject of this appeal. We find, however, that the annexation allowed by the Chancellor is not entirely reasonable. While Batesville has demonstrated a need to expand, it has not shown a need for such an aggressive annexation at this time. We are not persuaded that Batesville can and will provide municipal services to all of the proposed annexation area within a reasonable amount of time.

¶50. We are vested with the authority to affirm, reverse, or, in the appropriate case, modify an annexation. *See City of Greenville,* 513 So. 2d at 941-42; *Extension of the Boundaries of the City of Biloxi*, 361 So. 2d 1372 (Miss. 1978); *see also* Miss. Code Ann. § 21-1-33 (1990). The testimony at trial clearly indicated that the Brewer Road Area was essential to the annexation, as that tract of land provides an invaluable bridge between Batesville east and west of I-55, as well as a bridge between the uncontested contiguous areas north and south of Brewer Road. In addition, annexation of the Brewer Road Area will allow for a somewhat symmetrical eastern boundary for Batesville after the annexation. However, because of the 9.7 square miles otherwise allowed for annexation and the comparatively remote location of the E ½-Corridor 6 South Area, annexation should be disallowed of this area until Batesville has demonstrated its ability to extend the full range of municipal services to the areas already allowed here for annexation.

¶51. Therefore, we affirm the Chancellor's decision to allow annexation of the Brewer Road Area, but reverse his decision to allow annexation of the lower eastern quadrant where the other objectors reside. We remand this case to the Chancellor to redraw the boundary of the area permitted to be annexed consistent with this opinion.

¶52. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**PRATHER, C.J., PITTMAN AND BANKS, P.JJ., SMITH AND COBB, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN**

## OPINION. MILLS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY COBB, J.

### McRAE, JUSTICE, DISSENTING:

¶53. Municipalities are creatures of the legislature. Matters of annexation and enlargement of boundaries, therefore, are properly within the ambit of the legislature and not of this Court. *See In re Enlargement of Boundaries of Madison*, 650 So. 2d 490, 509 (Miss. 1995) (McRae, J., dissenting); *In re Boundaries of City of Jackson*, 551 So. 2d 861, 863 (Miss. 1989). It is incumbent upon the legislative branch to take annexations under its belt in order to give affected people a representative voice. Accordingly, I respectfully dissent.

¶54. This case provides yet another example of why the courts should not be the branch of government which decides the fate of cities, their size and direction of growth. Who are we to decide what is reasonable for the citizens of Batesville and its surrounding environs? In this case, the majority has found that it is reasonable for the City of Batesville to annex 9.7 square miles of contiguous land but not 16.7 miles. As the third branch, it is not for us to legislate. That is the responsibility of the legislature particularly as it affects the authority and geographical size of the municipality.

¶55. This Court has recognized that "[a]nnexation is a legislative affair, the judicial function is a matter of whether the annexation was reasonable." *In re Extension of the Boundaries of the City of Jackson*, 551 So. 2d at 863. But the more appropriate entity to determine whether annexations are reasonable is the legislative body. As Justice James L. Robertson pointed out in his concurrence in *In re Enlargement of the Corporate Limits of the City of Hattiesburg*, 588 So. 2d 814, 836 (Miss. 1991), the Legislature acts out of concern with what is best for the overall community, not as the courts do, applying legal standards, evidentiary rules and deciding for a particular party. *Id*. That the annexation monkey belongs to the Legislature is not a novel concept. *See Marshall v. City of McComb*, 251 Miss. 750, 755, 171 So. 2d 347, 348 (1965). The same should hold true today. Justice Robertson said, "The fact is that annexation remains essentially, inherently, generically legislative in nature." *Id*. at 835. *See also* [Attorney Gen. Ex rel. Kies v. Lowrey](), 199 U.S. 233, 240, 26 S. Ct. 27, 29, 50 L. Ed. 167 (1905) ("the legislature of the state has the absolute power to make and change subordinate municipalities"); *People ex rel. Averna v. City of Palm Springs*, 331 P.2d 4 (Cal. 1958) (wisdom or expediency of particular annexations is not a judicial question and courts can go no further than to see that the existing law is observed.); *State v. City of Stuart*, 120 So. 335 (Fla. 1929) (establishment of municipal boundaries is exclusively legislative power); *Town of Menasha v. City of Menasha*, 488 N.W.2d 104, 108 (Wis. Ct. App. 1992) (whether the annexation is in the best interests of the parties or the public is inherently a legislative matter and reviewing courts cannot second-guess the legislative wisdom of an annexation); 56 Am. Jur. 2d *Municipal Corporations, Counties & Other Political Subdivisions*, § 57 at 113 (1971) ("the power to annex contiguous territory to municipal corporations is a legislative power, existing exclusively in the legislature as an incident to the power to create and abolish municipal corporations at will. It is a power that neither the judicial nor the executive branches of the government can exert . . . .") (footnotes omitted).

¶56. Our opinions have evolved from the adoption of eight indicia of reasonableness to the current popular twelve. *See In re Extension of the Boundaries of the City of Columbus,* 644 So. 2d 1168 (Miss. 1994); *In re Extension of the Boundaries of the City of Jackson,* 551 So. 2d 861 (Miss. 1989); *City of Greenville v. Farmers, Inc.*, 513 So. 2d 932, 941 (Miss. 1987); *Dodd v. City of Jackson*, 238

Miss. 372, 118 So. 2d 319, 330 (1960). Of course, it all boils down to whether the chancellor is of the mindset to allow annexation because all he has to do is find some slim evidence to fit these court-created factors. Regardless, our scope of review is very limited. We reverse only where it can be said that the chancellor's decision is manifestly wrong, an abuse of discretion. *In re Exclusion of Certain Territory from the City of Jackson*, 698 So. 2d 490, 493 (Miss. 1997); *In re Corporate Limits of Hattiesburg*, 588 So. 2d 814, 819 (Miss. 1991). We stated in *Mayoza v. Mayoza*, 526 So. 2d 547, 549 (Miss. 1988):

> The existence of trial court discretion, as a matter of law and logic, necessarily implies that there are at least two differing actions, neither of which if taken by the trial judge will result in reversal. Abuse of discretion necessarily contemplates some third course of action not authorized by law and which, if taken, will result in reversal.

¶57. The majority in this case finds that a part of the chancellor's ruling was reasonable but that another part of the chancellor's holding was an abuse of discretion. In other words, the chancellor was only half reasonable. How the majority makes this distinction is beyond me. Once again, this Court has claimed for itself the role of "Super-Chancellor", a role that is ill- fitted to our expertise.

¶58. Furthermore, even if the chancellor pays more than lip service to these factors, there is no assurance that the annexing city will provide the higher quality of living that it purports to offer. As the majority concedes, the annexing city carries the burden of showing reasonableness by demonstrating that residents of the annexed areas will receive "something of value in exchange for their tax dollars." *City of Columbus,* 644 So. 2d at 1172. This is precisely the comment which proves the point that only the landowner who objects has true standing because the twelve indicia of reasonableness are geared towards protecting landowners. If the matter were left to a legislative body, all parties would have an opportunity to explain why they have an interest in the territory.

¶59. Unless this Court leaves annexations to legislative action, they will be thorns in the state judicial system's side forever, questioning reasonableness and adding more indicia in attempt to achieve an "answer" at great expense to all litigants with no guarantees or recourse provided by the city that promises, but fails to deliver.

¶60. If we are ever to improve our system of government, we must ensure that our citizens have a voice. Henceforth, all annexation cases should go before the Legislature where the people can be heard. Accordingly, I dissent.

## MILLS, JUSTICE, DISSENTING:

¶61. Because the manifest error standard of review combined with the ever-expanding definition of what is "reasonable" offers little or no guidance to those citizens who wish to oppose an annexation, or to a city which wishes to expand, I respectfully dissent consistent with the prior dissenting opinion of my brother, the late Presiding Justice Michael D. Sullivan, in *In re Boundaries of the City of Vicksburg*:

> What must a city show to expand? That it wants to, that it needs to, that someday it will provide some advantages not now available, and, of course, that it would be unreasonable not to allow annexation.

> What must protestors show to avoid being annexed? Who knows? But somehow they must convince the chancellor that to allow the annexation would be unreasonable.

To the end much time, effort, and money are spent parading witnesses and exhibits before the court in an effort to either convince or exhaust the chancellor. All in search of that elusive test "reasonableness." All hope the chancellor's lunch agreed with him. Cities have a need to expand and protestors have a right to object, but if there is no meaningful frame work in which to present these arguments, it is just so much empty noise.

In order that both sides may have a meaningful set of rules to follow that might better lead to reasonable results that can in some degree be measured by anyone, **I propose that a municipality, in order to go forward with any annexation, must first show by a preponderance of evidence, that it now adequately provides all municipal services to all areas already within municipal limits. If, in a bifurcated trial, the municipality meets this requirement, the city may then proceed to show why annexation is necessary, and exactly what, when and how it will provide services to the area to be annexed.**

**If this is accomplished, annexation may be granted but the chancellor's judgment must set out a time table for the city to accomplish what it claims it can for the newly annexed area. If, at the end of the period set out in the judgment the protestors can show by a preponderance of the evidence that the city has not provided the promised services, then the chancellor must set the annexation aside. If they fail, the chancellor shall confirm the annexation. . . .**

*In re Boundaries of the City of Vicksburg*, 560 So. 2d 713, 716-17 (Miss. 1990) (Sullivan, J., & Hawkins & Dan M. Lee. P.JJ., dissenting) (emphasis added).

¶62. For the reasons stated in the *City of Vicksburg* dissent, I would reverse and remand for a new trial consistent with these guidelines.

## COBB, J., JOINS IN PART.

1. Batesville also withdrew an additional 130 acres from the proposed annexation just prior to trial.

2. Batesville filed a petition for confirmation of extension of boundaries on May 22, 1996, and an amended petition on July 26, 1996. An attested copy of the duly passed Ordinance defining and enlarging the boundaries of the city was attached to the amended petition. Objections by several hundred residents within the proposed annexation area were filed, although some were subsequently withdrawn. The Chancellor granted Batesville partial summary judgment, finding that Batesville had complied with the procedural requirements for annexation, and that the Chancery Court had jurisdiction to order confirmation of the annexation ordinance. *See* Miss. Code Ann. §§ 21-1-15 & -31 (1990). These matters are not contested on appeal.

3. The Chancellor excluded three tracts of land: (1) 610 acres between Highway 35 and the Tallahatchie River, which the Chancellor concluded were in a flood plain, not within the path of growth of the city, and showed little potential for development; (2) 1,400 acres in the northeast corner of the proposed annexation area consisting mostly of a large gravel pit, which the Chancellor found to be removed from present or potential development, and (3) 43 acres west of Eureka Road, which were excluded based on the trial testimony of the owner thereof.

4. The current incorporated area comprises 11.8 square miles. With the additional uncontested 7.5 square miles, Batesville's total area will be 19.3 square miles, a substantial increase.

5. Panola County, Miss., Land Development Standards and Regulations (March 8, 1999).

APPENDIX "A"