# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-AN-00634-SCT

*IN THE MATTER OF THE EXTENSION OF THE BOUNDARIES OF THE CITY OF HATTIESBURG, MISSISSIPPI:*

*LAMAR COUNTY, MISSISSIPPI, LAMAR COUNTY MISSISSIPPI BOARD OF SUPERVISORS, DENNIS PIERCE, INC., DENNIS PIERCE, INDIVIDUALLY, OAK GROVE CONCERNED CITIZENS, INC., THOMAS PRICE, MELVA MAPLES, CRAIG FLANAGAN, DAVID COX, BILL HOVER AND JOYCE HOVER*

*v.*

*CITY OF HATTIESBURG, MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 3/22/2001 |
| TRIAL JUDGE: | HON. THOMAS WRIGHT TEEL |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | WILLIAM JENKINS GAMBLE, III |
| | WILLIAM H. JONES |
| | JACK B. WELDY |
| | ANTHONY ALAN MOZINGO |
| | JOSEPH EDGAR FILLINGANE |
| ATTORNEYS FOR APPELLEE: | JERRY L. MILLS |
| | CHARLES E. LAWRENCE |
| NATURE OF THE CASE: | CIVIL - MUNICIPAL BOUNDARIES & ANNEXATION |
| DISPOSITION: | AFFIRMED - 02/06/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Feeling aggrieved due to the special chancellor's entry of a final judgment on March 7, 2001, which judgment had the practical effect of granting the City of Hattiesburg's petition to annex five (5) separate and non-contiguous parcels of land located in neighboring Lamar County, thereby causing Hattiesburg (the county seat of Forrest County) to move further into Lamar County, the appellants/objectors[1] have appealed to this Court seeking relief by way of this Court's setting aside the chancellor's judgment granting annexation.  Acknowledging once again the judiciary's limited role in determining whether a municipality's exercise of its legislatively granted authority to enlarge its boundaries via annexation is reasonable, given the totality of the circumstances, we affirm the judgment of the Lamar County Chancery Court granting Hattiesburg's petition to annex, but we do so only after meticulous consideration of the record and the applicable law.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.     In June, 1999, the City of Hattiesburg (hereinafter "City" or "Hattiesburg"), adopted an ordinance seeking to annex five (5) separate and non-contiguous parcels of land lying wholly within adjoining Lamar County, with each of the five (5) parcels of land being contiguous to the City's existing boundaries.[2]  Upon a complaint for annexation being filed in chancery court, the objectors discovered certain errors within the

---

[1]The notice of joint appeal filed in the trial court lists the collective objectors to be Lamar County, Mississippi; the Board of Supervisors of Lamar County, Mississippi; Dennis Pierce, Individually; Dennis Pierce, Inc.; Oak Grove Concerned Citizens; Thomas Price; Melva Maples; Craig Flanagan; David Cox; Bill Hover; and, Joyce Hover. Although these parties joined this litigation at different times, and, some may not have been a party at certain times referred to herein, they still, for the sake of clarity and brevity, will be referred to collectively as "objectors."

[2]Miss. Code Ann. § 21-1-27 (Rev. 2001) is the statute authorizing annexation by municipalities, and this statute will be oft-cited throughout this opinion.

legal description of a portion of the proposed property annexation (PPA)[3] and filed a motion to dismiss. Evidently acknowledging fatal error due to an incorrect legal description in at least one parcel sought to be annexed, the City voluntarily dismissed its chancery court action to annex.

¶3.     However, the City acted in a reasonably prompt manner by re-adopting its annexation ordinance, with supposedly corrected legal descriptions of the PPA, at a specially called meeting on September 14, 1999.  The very next day, the City filed in the Chancery Court of Lamar County, Mississippi, its "Complaint in the Nature of a Petition for Ratification, Approval and Confirmation of an Ordinance Extending and Enlarging the Boundaries of the City of Hattiesburg, Mississippi," attaching to its complaint, a certified copy of the newly adopted ordinance.  In accordance with Miss. Code Ann. § 21-1-27, the City's ordinance contained legal descriptions of each of the five (5) parcels of land sought to be annexed, and a legal description defining the entire boundary of the City, as enlarged after annexation.  Also, pursuant to § 21-1-27, the City's ordinance (via Sections 3 and 4) described in general terms the proposed improvements to be made in the PPA, the manner and extent of such improvements, and a timetable for making the improvements, and contained a statement as to the municipal and public services to be furnished by the City to the PPA.

¶4.     The three Chancellors of the Tenth Chancery Court District recused themselves from this case, for good cause, and the Chief Justice of this Court appointed Honorable Thomas Wright Teel, one of the

---

[3]The chancellor and the parties in this case refer to the property proposed to be annexed as the "proposed property annexation" (PPA); therefore this Court will use the "PPA" designation.  However, in at least some of the prior annexation cases decided by this Court, the area proposed to be annexed has been referred to as the "proposed annexation area" (PAA).  *See, e.g., **In re Extension of the Boundaries of the City of Columbus**, 644 So.2d 1168, 1170 (Miss. 1994).  So whether referred to herein as "PPA" or "PAA", it is the intention of the Court to refer to the five (5) parcels of land in Lamar County which Hattiesburg has sought to annex in this case.

3

Chancellors from the Eighth Chancery Court District, to preside in this case.[4] From this point forward, there was considerable activity in the life of this annexation case, as numerous pleadings, including various objections, were filed, and extensive discovery was conducted by the parties. Of considerable note is a hearing conducted by Chancellor Teel on June 16, 2000, which hearing was memorialized by the chancellor's entry of a nine-page order on June 23, 2000. This order, inter alia, (1) granted the City's motion to amend its pleadings by way of correcting certain legal descriptions of the PPA, (2) denied various objectors' motions to dismiss and motion to bifurcate, (3) directed the City, upon the filing of its amended petition, to republish and re-post notice as required by law and consistent with the order, (4) allowed the objectors to likewise amend their pleadings, and (5) canceled the then existing August, 2000 trial date.

¶5.     It is worth noting here that this Court finds the allegations of the City's motion to amend the legal descriptions to be enlightening, because in its motion, the City alleges, inter alia:

> 1. That on or about the 22nd day of June, 1999, [the City] adopted and (sic) ordinance seeking to annex the territory sought herein. In response thereto, the Lamar County engineer was engaged by objectors to review the legal description thereof. As a result of said review, he submitted a letter setting out alleged errors he found in said description. A copy of this letter is attached hereto, as Exhibit A.
>
> 2. Thereafter certain parties objecting (sic) to the proceedings setting out only one of the alleged errors the County Engineer reported to them in his review of the pleadings. As a result, [the City] dismissed the pending litigation, corrected the only alleged error, readopted its ordinance, and refilled (sic) this matter.
>
> 3. Upon the refilling (sic), the objectors raised other alleged errors which were set out in Exhibit A, but not disclosed to [the City] or the Court in the pervious (sic) filings. During discovery, Exhibit A was first provided to movant.

---

[4]See Miss. Code Ann. § 9-1-105 (Rev. 2002).

4. Following the production of Exhibit A, [the City] sought to take the deposition of the County Engineer to make certain that his review revealed no other alleged errors. The deposition was delayed until May. When the deposition was taken Mr. Walker, the County Engineer, testified that the description as contained in the current ordinance contained two typographical errors, but as an engineer he could located (sic) the territory on the ground. Additionally, he was able to plat the areas sought to be annexed.

5. [The City] desires to amend its ordinance and pleadings so as to remove any room for question or doubt as to the description.

6. [The City] seeks to neither add or (sic) remove any property form (sic) the area sought to be annexed.

7. No party would suffer any prejudice as a result of the proposed amendment.

The attached Exhibit A to which reference is made in the City's motion to amend is indeed a letter of July 23, 1999 from Engineer Walker to counsel for the objectors, wherein Walker reveals five (5) errors in the legal descriptions, three of the errors pertaining to the legal description of Parcel A and two of the errors pertaining to the legal description of Parcel C. Yet, it is disturbing to the Court that evidently only one of the five errors was disclosed by counsel for the objectors. Upon learning of this "one" error in the legal descriptions of the PPA, the City sought and obtained a court dismissal of its initial annexation petition, and then filed the second annexation petition with the "one" correction in the legal descriptions; however, as the responsive pleadings began to be filed by the various parties to this second annexation petition, the other four errors in the legal descriptions were revealed (evidently for the first time) to the City. Chancellor Teel noted this fact in his order granting the amended legal descriptions when he stated that since Lamar County notified the City of only one error in the property descriptions, the remaining "undisclosed errors pertaining to the descriptions of parcels remained uncorrected in the ordinance and petition filed in the instant action."

5

¶6. On July 7, 2000, certain objectors, feeling aggrieved by the chancellor's grant of the City's motion to amend certain legal descriptions of the PPA, filed a motion for interlocutory appeal pursuant to the Mississippi Rules of Appellate Procedure (M.R.A.P.).[5] The chancellor, by order entered on August 31, 2000, granted the objectors' motion and certified this issue to this Court for consideration via an interlocutory appeal.[6] By order dated October 10, 2001, a three-judge panel of this Court denied the objectors' petition for an interlocutory appeal.

¶7. Pursuant to prior order setting the City's amended complaint/petition for annexation for hearing, the chancellor called this case up for hearing on February 5, 2001, at the Lamar County Courthouse in Purvis.[7] On that day, two attorneys appeared for the first time in this action, stating that they had been recently retained to represent various objectors and that they needed a continuance to prepare. The chancellor considered and denied their motions, proceeded to a hearing which lasted twelve (12) days, over a period from February 5, 2001, through February 20, 2001, and at the end of the hearing, took this case under advisement for further consideration of the testimony of the witnesses, arguments of counsel, the pleadings, numerous exhibits, and the applicable law. On March 7, 2001, the chancellor entered a thorough thirty-one page judgment which granted in toto Hattiesburg's annexation petition. Within the chancellor's judgment, there is contained a succinct description of Hattiesburg, its annexation history, and, a description of the 5 parcels comprising the PPA:

---

[5]See M.R.A.P. 5(a).

[6]As this Court stated in *American Elec. v. Singarayar*, 530 So.2d 1319, 1322 (Miss. 1988), that while the trial court may in good faith issue a Rule 5 certification of an issue for consideration by this Court via an interlocutory appeal, it is still this Court which must, in the end, determine pursuant to a de novo review as to whether to grant the application for interlocutory appeal.

[7]The order setting this case for trial was entered on August 11, 2000, 178 days prior to the hearing date.

Hattiesburg is a city covering 49.7 square miles with roughly 49,233 people. Although most of Hattiesburg lies within Forrest County, a portion lies within neighboring Lamar County. Lamar County has, including residents of Hattiesburg in Lamar County, a total of about 38,127 residents. Lamar County is about 500 square miles in area.

Hattiesburg, since at least 1966, has occupied that portion of Lamar County between the Lamar-Forrest County line and Interstate 59. Then, in 1979, Hattiesburg annexed a small portion on the West side of I-59, both North and South of Highway 98, part of the Highway 98 corridor, and another area on the North side of 98. Subsequent annexations in 1981, 1985, 1989 and 1998 have added to that portion of Hattiesburg lying inside Lamar County. Each of these annexations bordered the Highway 98 corridor.

Additionally, Hattiesburg has also expanded in Forrest County. In 1972, the City took a small portion to the North and South of the City. In 1982, the City annexed land around both the I-59 and Highway 49 cloverleaf, and around the Highway 49 corridor to the Highway 49-Highway 98 cloverleaf.

Hattiesburg's westerly annexations have been contentious. Although this Court finds no appeals concerning a number of the Lamar County territory annexations; after the City of Hattiesburg filed its 1987 annexation petition seeking around 80 square miles of territory in Lamar and Forrest Counties, citizens of Lamar County attempted to incorporate into Oak Grove, seeking about 40 square miles of territory. Those litigations are found in *Incorporation of the City of Oak Grove v. City of Hattiesburg*, 684 So.2d 1274 (Miss. 1996) and in *Matter of Enlargement of Corporate Limits of City of Hattiesburg*, 588 So.2d 814 (Miss. 1991).

The PPA contains five non-contiguous areas: Parcel "C", the largest parcel, which contains at least 50% of the PPA, follows the Highway 98 corridor, both North and South, extending from the Turtle Creek Mall area to the Highway 11 intersection and, then, extends along the Highway 11 corridor to the bottom of that 16th Section land and, also, down the Lamar Boulevard corridor to Sandy Run Road; Parcel "A", the next largest parcel, contains about 35% of the PPA, and it covers the I-59 corridor from the county line intersection to Hattiesburg's present city limits at the I-59-Hwy. 98 intersection, together with the largest acreage on the Lincoln Road extension; Parcel "D", the third largest parcel, contains about 10% of the PPA, and is situated between parcels annexed

7

in 1979, 1981, and 1989; Parcel "B", about 5% of the PPA, is just South of a parcel annexed in 1989 and adjacent to part of the 1985 annexation; and, Parcel "E" is a small portion just North of the Turtle Creek Mall and fronting on West Fourth Street.

The majority of Parcels "A", "D" and "E", are undeveloped. Parcel "C", to generalize, has about 1/3rd of its space occupied by a planned subdivision, with a few homes already build (sic); about 1/3rd of its space built-out, and, about 1/3rd is undeveloped. Parcel "B" is mostly built-out.

There are estimated to be about 630 people living in the PPA; however, as the area is primarily commercial, there are few occupied houses. The main area of residence is a 250 apartment complex with 250 apartments just outside the North-East boundaries of the city and within a stone's throw of I-59.

¶8.    Concluding this annexation proceeding at the trial court level, the chancellor entered a sixteen page "Final Judgment Approving the Enlargement and Extension of the Boundaries of the City of Hattiesburg, Mississippi" from which the objectors appeal and raise the following issues:

I.      **Whether the Lamar County Chancery Court erred in its order of June 23, 2000, wherein the court allowed the City of Hattiesburg, Mississippi, to amend the legal description of the area proposed for annexation;**

II.     **Whether the Lamar County Chancery Court erred in not dismissing the case once it went to trial as there were still errors with the legal description at the time of trial**;

III.    **Whether the Lamar County Chancery Court erred in determining that the proposed annexation by the City of Hattiesburg, Mississippi, was reasonable and should be granted given the totality of the evidence presented at trial; and,**

IV.     **Whether Mississippi Code 1972, Section 21-1-27 is constitutional.**

**DISCUSSION**

I.      **WHETHER THE LAMAR COUNTY CHANCERY COURT ERRED IN ITS ORDER OF JUNE 23, 2000, WHEREIN THE COURT**

8

**ALLOWED THE CITY OF HATTIESBURG, MISSISSIPPI, TO AMEND THE LEGAL DESCRIPTION OF THE AREA PROPOSED FOR ANNEXATION.**

II.    **WHETHER THE LAMAR COUNTY CHANCERY COURT ERRED IN NOT DISMISSING THE CASE ONCE IT WENT TO TRIAL AS THERE WERE STILL ERRORS WITH THE LEGAL DESCRIPTION AT THE TIME OF TRIAL.**

¶9.    In granting the City's amendments to the legal descriptions of the PPA, and in denying the objectors' motion to dismiss the case prior to trial because of alleged errors in the legal descriptions of the property, the chancellor obviously was dealing with questions of law. Since we are here confronted with the chancellor's rulings on questions of law, the ordinarily applied deferential rule of "manifest error/substantial evidence" is of no moment inasmuch as we are not prevented from conducting a de novo review of the chancellor's actions on these issues. *Holliman v. Charles L. Cherry & Assocs., Inc.*, 569 So.2d 1139, 1145 (Miss. 1990); *Planters Bank & Trust Co. v. Sklar*, 555 So.2d 1024, 1028 (Miss. 1990).

¶10.    It will be recalled during the pendency of the first annexation petition that although the Lamar County engineer revealed to the objectors five errors in the legal descriptions of portions of the PPA, the objectors, for reasons known only to them, chose to reveal only one of these five errors to the City, which promptly sought and secured from the chancery court a dismissal of its first annexation petition due to this "flaw." Upon adoption of a new ordinance with the "corrected" legal description as revealed by the objectors, the City unwittingly filed its second annexation petition in court with the yet to be revealed remaining legal description errors still intact. Thereafter, the objectors were not begrudging in bringing to the chancery court's attention the remaining errors in the legal descriptions and sought relief via a second

9

dismissal, or at least a continuance. Indeed the objectors claim that the legal description errors were so egregious that they deprived the chancery court of jurisdiction because of the existing statutory mandates.

¶11.    Miss. Code Ann. § 21-1-27 states that in pertinent part:

> When any municipality shall desire to enlarge or contract the boundaries thereof by adding thereto adjacent unincorporated territory or excluding therefrom any part of the incorporated territory of such municipality, the governing authorities of such municipality shall pass an ordinance defining with certainty the territory proposed to be included in or excluded from the corporate limits, and also defining the entire boundary as changed. In the event the municipality desires to enlarge such boundaries, such ordinance shall in general terms describe the proposed improvements to be made in the annexed territory, the manner and extent of such improvements, and the approximate time within which such improvements are to be made; such ordinance shall also contain a statement of the municipal or public services which such municipality proposed to render in such annexed territory.

¶12.    The objectors assert that in an annexation case, the proponents of the annexation must, pursuant to statutory mandate, correctly describe the territory proposed to be annexed (the PPA), failing which the court is without jurisdiction to hear the annexation case. Both the objectors and the City rely on *In re Confirmation of Alteration of the Boundaries of the City of Horn Lake*, 630 So. 2d 10 (Miss. 1993), to support their respective positions, and as a result, it is not surprising that they impose different interpretations on what we held, or did not hold, in that case. In *Horn Lake*, the ordinance adopted by Horn Lake had correctly described the PPA, but the legal description of the entire city boundary as changed contained an error. The City of Southaven moved to dismiss Horn Lake's annexation petition because of this erroneous description; however, the chancellor granted Horn Lake leave to amend its petition to correctly describe the entire city boundary as changed upon enlargement.[8] On appeal to this

---

[8] In the *Horn Lake* case, the City of Horn Lake initially commenced annexation efforts, and the City of Southaven thereafter commenced annexation efforts, with the end result being that while the two

10

Court, Southaven claimed the chancellor's granting Horn Lake leave to amend the petition to be error inasmuch as the requirements of Miss. Code Ann. § 21-1-27 (1972) were mandatory in that the annexation ordinance must:

> 1) define with certainty the territory proposed to be included in or excluded from the corporate limits;
> 2) define the entire boundary as changed;
> 3) describe in general terms the proposed improvements to be made;
> 4) describe the manner and extent of such improvements and the approximate time within which such improvements are to be made; and,
> 5) contain a statement of municipal or public services the municipality proposes to render in the annexation area.

630 So.2d at 14.  To support its assertions, Southaven cited to the ***Horn Lake*** court our decision in ***Dodd v. City of Jackson***, 238 Miss. 372, 118 So.2d 319 (1960).  In the case sub judice, the objectors allege that not only were there errors in the legal descriptions of the PPA, but there were also errors in the legal description of the entire city boundary as it would exist upon enlargement (annexation). Additionally, the objectors here attempt to distinguish our decision in ***Horn Lake***, claiming that Horn Lake's mistake was by way of incorrectly describing the entire city boundary as changed after annexation as opposed to Hattiesburg's errors here in incorrectly describing the PPA, which, according to the objectors, are fatal to Hattiesburg's case.   In ***Horn Lake***, we stated on this issue:

> *Dodd* states that the requirements concerning improvements,  public services, and the extent and time within which they are to be made, by operation of law, have to be set forth in the ordinance.  238 Miss. at 382, 188 So.2d at 323.  *Dodd* did not state that the requirements call for "defining with certainty the territory proposed to be included in or excluded from the corporate limits, and also defining the entire boundary as changed." *See* Miss. Code Ann. § 21-1-27.  Southaven has failed to

---

cities were not attempting to annex the exact same property, at least some of the property sought to be annexed by the two cities was included in their respective annexation ordinances. In due course, both annexation cases were consolidated for trial purposes.

cite any authority from which this Court could conclude that the other requirements of § 21-1-27 are mandatory.

The crucial language of § 21-1-27 states that when annexation is sought by a municipality, the governing authorities shall "pass an ordinance defining with certainty the territory proposed to be included in or excluded from the corporate limits, and also defining the entire boundary as changed." Horn Lake described with certainty the territory proposed to be included. The city's mistake came in describing the entire boundary of the city after annexation because the ordinance erroneously omitted a previously annexed tract of land. This mistake did not cause any uncertainty about the territory which Horn Lake desired to annex.

¶13. In *Dodd* we held that "If the title fairly gives notice of the subject of the ordinance, so as to reasonably give notice and lead to an inquiry into the body, that is all that is necessary." 238 Miss. at 382, 118 So.2d at 323 (citing *Richards v. Town of Magnolia*, 100 Miss. 249, 56 So. 386, 387 (1911)). As we stated in *Horn Lake*, *Dodd* stood for the proposition that the omission of the "promises as to improvements and services" from the *title* of the annexation ordinance did not render it void. *Dodd* only makes mandatory the inclusion in the ordinance of the statutorily mandated "requirements concerning improvements, public services, and the extent and time within which they are to be made." *Id*.

¶14. The objectors also argue that the practice of liberal amendments to pleadings, as permitted in Miss. R. Civ. P. 15, does not pertain to annexations due to Miss. R. Civ. P. 81(a)(11) which specifically excludes the "creation of and change in boundaries of municipalities."[9] This Court has specifically addressed this

_____

[9]The objectors are not entirely correct as to this assertion. Miss. R. Civ. P. 81(a)(11) states:

**(a) Applicability in General.** These rules apply to all civil proceedings but are subject to limited applicability in the following actions which are generally governed by statutory procedures.......(11) creation of and change in boundaries of municipalities.

Statutory procedures specifically provided for each of the above proceedings shall remain in effect and shall control to the extent they may

12

issue by holding that many "technical deficiencies" in a petition for annexation were amendable pursuant to Miss. R. Civ. P. 15:

> While rules are necessary and their governance must be respected, in matters of the importance of the core controversy with which we are here concerned, we should be slow to allow insubstantial procedural niceties to interfere with the pursuit of justice.

*In re City of Ridgeland*, 494 So.2d 348, 354 (Miss. 1986). A fair reading of the annexation statutes, Miss. R. Civ. P. 15(a), Miss. R. Civ. P. 81(a)(11), and our applicable case law leaves no doubt that, in most instances, annexation pleadings are amendable pursuant to Miss. R. Civ. P. 15. So that our interpretation is clear, we clarify today that in annexations proceedings, when errors appear in the legal description of the territory proposed to be annexed *and/or* in the legal description of the entire boundary as changed after enlargement/annexation, such errors may be amended pursuant to our rules of civil procedure and our case law. It must be remembered that the *Horn Lake* court made clear that pursuant to *Dodd*, the only requirements of § 21-1-27 which are mandatory and must be set forth in the annexation ordinance are those "concerning improvements, public services, and the extent and time within which they are to be made," and there is no existing authority which would cause us to conclude that the remaining requirements of the statute are mandatory.[10] 630 So.2d at 15.

---

be in conflict with these rules; otherwise these rules apply.

The Comment under this rule also contains language consistent with this rule, and acknowledges that if the statute is silent as to a procedure, the Miss. R. Civ. P. will apply.

[10]In other words, we stated in *Horn Lake* that "*Dodd* did not state that the requirements call for `defining with certainty the territory proposed to be included in or excluded from the corporate limits, and also defining the entire boundary as changed.'" 630 So.2d at 15.

¶15. Certainly, the objectors were in no way prejudiced by the amended legal descriptions pertaining to the PPA and the entire boundary as changed. In addition to the lengthy and confusing legal descriptions, a correct map of the proposed areas for annexation was attached to both the original and the amended ordinances. Additionally, no prejudice has been shown in the record as to either the original or amended ordinances. Bennie Sellers, Director of Public Services for the City of Hattiesburg, who is also a licensed professional engineer and licensed professional land surveyor, testified that the portions to be annexed could be physically established from the original ordinance, as well as the amended ordinance:

> Q: Have you had an opportunity to view the legal descriptions contained in the notices published in this case with regard to the areas the City of Hattiesburg seeks to annex?
>
> A: Yes, I have read the–not only did I–was instrumental in preparing it, but I have read it on numerous occasions, and you can locate the boundaries in the field by using good surveying practices. It can all be physically established.
>
> Q: Does that apply only to the individual parcels or to each of the descriptions contained in the ordinance?
>
> A: Each of the descriptions contained in the ordinance.
>
> Q: And you're aware that there was a contention that there was an error in the overall description, not in the parcels?
>
> A: Yes, sir
>
> Q: Did you have an opportunity to review the purported error in that regard?
>
> A: I did. And the boundaries can still be located according to the way the description is presently–was written.
>
> Q: And would you be capable of locating it utilizing sound principles of both engineering and land surveying?
>
> A: Yes.

14

Q: Would it be consistent with the professional standards which you've utilized over many years in that regard?

A: Yes, it would be.

¶16.     The objectors offered Lamar County Engineer Don Walker as a witness, but the chancellor excluded Walker's expert testimony based on a discovery violation by the objectors. However, a proffer of Walker's testimony was made. Walker is a civil engineer in private practice and is also a registered engineer and land surveyor. After the special chancellor allowed the proffer, Walker testified that the errors in the legal descriptions pertained to the entire boundary after the change and not to any of the individual parcels of land to be annexed. Walker acknowledged that the errors in the legal descriptions of the individual parcels to be annexed had been corrected. Walker's testimony was a proffer, and there is admitted testimony from an expert who testified that the legal descriptions of both the five parcels of land proposed to be annexed and the entire boundary after annexation were sufficient to the extent that by utilizing sound principles of both engineering and land surveying, the boundaries to the property could be located on the ground.

¶17.     For the reasons stated, the objectors' claims of error as to the chancellor's permitting the City to amend the legal descriptions of the PPA, and as to the chancellor's failure to dismiss the case due to errors in the legal description to the property are without merit.

## STANDARD OF REVIEW IN ANNEXATION PROCEEDINGS

¶18.     This Court's standard of review for annexation is very limited. The Court can only reverse the chancery court's findings as to the reasonableness of an annexation if the chancellor's decision is manifestly wrong and is not supported by substantial and credible evidence. *In re Enlargement and Extension of Mun. Boundaries of City of Madison v. City of Madison*, 650 So.2d 490, 494 (Miss. 1995).

15

We also stated "[w]here there is conflicting, credible evidence, we defer to the findings below." *Bassett v. Town of Taylorsville*, 542 So.2d 918, 921 (Miss. 1989). "Findings of fact made in the context of conflicting, credible evidence may not be disturbed unless this Court can say that from all the evidence that such findings are manifestly wrong, given the weight of the evidence." *Id.* at 921. "We only reverse where the Chancery Court has employed erroneous legal standards or where we are left with a firm and definite conviction that a mistake has been made." *Id.*

### III. DID THE SPECIAL CHANCELLOR ERR IN DETERMINING THAT THE PROPOSED ANNEXATION WAS REASONABLE UNDER THE TOTALITY OF THE CIRCUMSTANCES?

¶19.    This Court has set forth a list of factors – indicia of reasonableness – to guide the chancellor in a determination of the reasonableness of a city's annexation request. The Court first enumerated these factors in *Dodd v. City of Jackson*, 238 Miss. 372, 396-97, 118 So.2d 319, 330 (1960), and in later decisions has expanded the list. *In re Enlargement of Corporate Limits of Hattiesburg*, 588 So.2d 814, 818-19 (Miss. 1991). This list of appropriate considerations for the chancery court has since grown to twelve. *In re Enlargement of Corporate Limits Boundaries of City of Gulfport*, 627 So.2d 292, 293 (Miss. 1993). "These factors, however, are only indicia of reasonableness, not separate and distinct tests in and of themselves." *Bassett,* 542 So.2d at 921. The chancellor must consider all of these factors and determine whether under the totality of the circumstances the annexation is reasonable. *Id*. at 921-22. *See also* *In re Extension of the Boundaries of the City of Vicksburg*, 560 So.2d 713, 716 (Miss. 1990); *In re Enlargement of Corporate Boundaries of the City of Booneville v. City of*

*Booneville*, 551 So.2d 890, 892 (Miss. 1989); *In re Extension of the Boundaries of the City of Jackson*, 551 So.2d 861, 864 (Miss. 1989).

¶20.    A determination of "reasonableness" has taken on a rather dubious connotation in Mississippi jurisprudence. From *In re Extension of the Boundaries of the City of Columbus*, 644 So.2d 1168, 1171 (Miss. 1994), we find this language:

> As the law now stands, "The judicial function is limited to the question whether the annexation is reasonable." *Jackson*, 551 So.2d at 863. Reasonableness is determined by analyzing twelve factors announced by this Court in prior cases to see what they "indicate." *Id*. This approach has been criticized as arbitrary for failing to provide adequate guidelines for reaching the ultimate determination. *See In the Matter of the Enlargement of the Corporate Limits and Boundaries of the City of Gulfport*, 627 So.2d 292 (Miss. 1993), (Smith, J., dissenting, "I am convinced that the test has been expanded so far that now it is absolutely meaningless."); *Matter of Boundaries of City of Vicksburg*, 560 So.2d 713 (Miss. 1990) (Sullivan, J. dissenting, " 'Reasonable' is now determined by the length of the chancellor's nose, or foot, if you prefer."); *Matter of the Boundaries of City of Jackson*, 551 So.2d 861, 878 (Miss. 1989) (Blass, J. dissenting, "[T]he proliferation of 'indicia of reasonableness,' ... can only lead one to the conclusion that 'indicia of reasonableness' are either now devoid of substance or so malleable as to be meaningless."). Although we retain our "indicia" for the purposes of today's decision, we emphasize that fairness to all parties has always been the proper focus of our reasonableness inquiry. Thus, we hold that municipalities must demonstrate through plans and otherwise, that residents of annexed areas will receive something of value in return for their tax dollars in order to carry the burden of showing reasonableness.

¶21.    The test of reasonableness, then, has evolved into the twelve indicia, as well as an emphasis on whether residents in the annexed areas will receive anything of value in exchange for their tax dollars should the annexation be approved.

17

¶22.    The twelve indicia, as stated in **Columbus**, 644 So.2d at 1173 (citing **Jackson**, 551 So.2d at 864), are as follows:

> (1) the municipality's need for expansion, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) the potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised, (5) the need for zoning and overall planning in the area, (6) the need for municipal services in the area sought to be annexed, (7) whether there are natural barriers between the city and the proposed annexation area, (8) the past performance and time element involved in the city's provision of services to its present residents, (9) the impact (economic or otherwise) of the annexation upon those who live in or own property in the area proposed for annexation area,[11] (10) the impact of the annexation upon the voting strength of protected minority groups,[12] (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and in the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy the (economic and social) benefits of proximity to the municipality without paying their fair share of taxes,[13] and (12) any other factors that may suggest reasonableness, *vel non*.[14]

## 1. THE NEED TO EXPAND

### *a. The parties' contentions*

¶23.    The objectors argue that Hattiesburg should develop the usable vacant land within the existing city limits, and that Michael Bridge, the city's expert, contradicted himself in the case sub judice and other cases in which he has been an expert. In **Matter of Enlargement and Extension of the Mun.**

---

[11]*See* **Western Line Consol. Sch. Dist. v. City of Greenville**, 465 So.2d 1057, 1059 (Miss. 1985).

[12]*See* **Enlargement of Boundaries of Yazoo City v. Yazoo City**, 452 So.2d 837, 842-43 (Miss. 1984).

[13]*See* **Texas Gas Transmission Corp. v. City of Greenville**, 242 So.2d 686, 689 (Miss. 1971); **Forbes v. Mayor & Bd. of Aldermen of City of Meridian**, 86 Miss. 243, 38 So. 676 (1905).

[14]*See* **Bassett v. Town of Taylorsville**, 542 So.2d 918, 921 (Miss. 1989).

*Boundaries of the City of Jackson*, 691 So.2d 978, 981 (Miss. 1997), Bridge testified about "leap frog development" in a case where Jackson attempted unsuccessfully to annex part of Byram.[15]  Bridge's testimony concerned his opinion as to why it was poor planning to have "leap frog development", where there were vacant and developable areas within the existing city limits:

> When you have vacant developable land that's not put into productive urban use, then it essentially tends to be a drain on the economy and the fiscal structure of the city. Vacant land--normally to go from developed area to vacant land to another developed area, you have to have roads. The utilities have to extend through that vacant area. So the city is in a position where they have expended in may (sic) instances significant resources to extend infrastructure into vacant areas and through vacant areas, and if the area does not develop or is not encouraged to develop, then it becomes a drain on the city because they have to extend those lines further and further. Those are not in productive uses. When those vacant lands go into productive uses, then they tend to strengthen the tax base. The converse, when you continually stretch the rubber band, you know, ultimately it will break. The concept of strengthening the tax base by ignoring the vacant land resources within the existing city is on the simplest basis just totally wrong.

¶24.    We find the objectors' arguments regarding Bridge unpersuasive.  Bridge was testifying in a totally different case about a matter that is not analogous to the case sub judice.  In the *Jackson* annexation case, we found that the annexation was unreasonable when Jackson sought to annex 25 square miles south of the city limits, citing population decrease in the existing city limits, as well a lack of need to expand to contain anticipated growth.  We wrote that the Jackson annexation effort amounted to nothing more than an attempt to annex more territory for the purposes of raising tax revenue, which we held impermissible.

¶25.    Hattiesburg's brief counters the objectors' arguments regarding the Bridge testimony, and adds there is no "magic buildout" figure required before an annexation is reasonable.  Hattiesburg cited the

---

[15]Actually the chancellor ruled in the City of Jackson's favor, but on appeal, this Court reversed and rendered, holding that the City's proposed annexation of Byram was not reasonable.

examples of Southaven (43 percent vacant), Madison (59 percent vacant), and Ridgeland (48 percent vacant) as buildout figures where this Court has allowed annexation to proceed.

### b. The chancellor's findings

¶26.    The chancellor found that Hattiesburg was "bursting at the seams," especially along the U.S. Highway 98 corridor in Lamar County.  He also noted that there have been "numerous attempts" at annexation in the last twenty years in the same area.  As was noted in the opinion, and as is evident from the exhibits (excluding aerial photographs the chancellor found supported his findings which are not included in our record, but cited by the trial court), Hattiesburg is growing largely in the direction of the area proposed for annexation.        The chancellor took a bus tour of the PPA and afterward stated:

> [O]ne knew when entering the PPA : the traffic volume along Hardy Street-Highway 98 was equally strong going into and out of Hattiesburg; however, once leaving the area around incorporation in Lamar County, the traffic volume dramatically dropped.  Perhaps spurring some of this growth in the PPA are businesses that have relocated to the Highway 98 corridor from older Hattiesburg, including Wesley Hospital (formerly Methodist Hospital), stores at Turtle Creek Mall, and Petro Motors.  This growth also mirrors Hattiesburg's internal growth.  The cities' population has increased about 10% since 1990 (H-16), as well, the building permits also continue to increase (H-8, 9, 10).

¶27.    The chancellor also found that Hattiesburg had "clearly established its natural areas of expansion." He found that the city was bordered to the North and East by the Leaf River and the Bowie River and the flood plains adjacent to those rivers.  Also, he found that though there were large sections of undeveloped land in South Hattiesburg, there were impediments to development.  First, a large portion of the land was owned by a wealthy family which was developing the land at "their own pace." Second, another portion of the area was described by the chancellor as a low income area that will need more time to develop.  He further found that the PPA had been "developing without city entanglements" and lacked regional planning.

The chancellor noted that "haphazard growth, the lack of infrastructure, and the lack of building codes is not in the best interests of future owners and residents of the area."

¶28.    The chancellor also found that because Hattiesburg is growing, it needed a tax base to continue its growth. As noted by the chancellor, "Hattiesburg is the obvious economic engine in the region."

¶29.    The chancellor addressed the objectors' contention that Hattiesburg had no need to annex because 40 percent of its existing area was vacant land, and in so doing, the chancellor found this evidence unreliable because it was not derived from expert testimony or other evidence.   Moreover, the chancellor found that, unlike *Jackson*, 691 So.2d at 981, Hattiesburg's existing vacant land would not burden the city.

¶30.    Accordingly, the chancellor found Hattiesburg's need to expand was reasonable.

*c. Supporting Evidence*

¶31.    Bennie Sellers, Director of Public Services for the City of Hattiesburg, has worked for the City of Hattiesburg since 1990.  He testified as to the city's need to expand by giving a history of the City's growth since he had been a city employee.  Sellers testified that in 1990, the primary development was in the Westover-Highway 98 area, along the south side, but since that time, there had been continued westward growth by the City.

¶32.    Sellers also testified that due to westward growth of the city, it was decided that a one million gallon water tank would be needed, instead of the original proposed 500,000 gallon tank.  As far as the City's growth into the PPA, Sellers testified that existing businesses had relocated and built in the PPA, that numerous new businesses had built in the PPA, and that there were service stations, restaurants, shops, construction and equipment companies, banks, a car dealership, and a church either being built or already completed in the PPA. Sellers testified that "[w]e've had numerous developments there" and that "you've

21

just seen tremendous growth along the old Highway 11......So it's been numerous growth has just continued to the west."

¶33.	Michael Bridge, the city's expert, testified that Hattiesburg had experienced a growth of over 4,000 people when he compared the 1990 census numbers to the 1999 estimates. Such growth, he testified, "clearly" points out a need for municipal expansion.

*d. conclusion*

¶34.	The ***Jackson*** annexation case is instructive here. Jackson's annexation, we determined, was unreasonable because the City simply did not need the land. However, the chancellor found, reasonably so, that Hattiesburg's growth is concentrated in the part it seeks to annex. Moreover, as noted by the chancellor, Hattiesburg is "bursting at the seams" along the Highway 98 corridor.

¶35.	The objectors also argue that there is testimony concerning Hattiesburg's having greater than 40 percent of usable vacant land within the City.[16] We have declined to set an absolute amount of usable vacant land that would prevent annexation. As Hattiesburg has pointed out, we have approved annexation in Southaven, Madison, and Ridgeland, which had usable vacant land of 43%, 59%, and 48%, respectively. ***Matter of City of Horn Lake***, 630 So.2d 10, 18 (Miss. 1993); ***Enlargement and Extension of Mun. Boundaries of City of Madison v. City of Madison***, 650 So.2d 490, 496 (Miss. 1995); ***Extension of Boundaries of City of Ridgeland v. City of Ridgeland***, 651 So.2d 548, 554-56 (Miss. 1995). The record is unclear as to how much land within Hattiesburg's borders is actually usable vacant land, but the point is moot. We simply have no established number that must be reached to entitle a city automatically to expand.

_____

[16]We must also keep in mind that the chancellor found this evidence as to percentage of usable vacant land to be unreliable.

¶36. The chancellor's findings as to Hattiesburg's need to expand are supported by substantial and credible evidence.

## 2. PATH OF GROWTH

### a. the parties' contentions

¶37. The objectors do not argue that the PPA is not within the path of growth of the city. Instead, they argue that this indicium of reasonableness goes to what role the City played in the growth of the area, and in so doing, the objectors argue that "[t]he city has the burden of proving that the area grew because of the City, not in spite of it." They contend there is no ascertainable "path of growth," as Hattiesburg is growing in all directions. Hattiesburg concedes that there is not a single path of growth, but that the area proposed for annexation lies in "a" path of growth.

### b. the chancellor's findings

¶38. As to this issue, the chancellor addressed each parcel individually. He found parcel A "was in Hattiesburg's obvious path of growth." Additionally, the chancellor noted that First Baptist Church of Hattiesburg purchased 40 acres in Parcel A. He noted that both city and county experts believed parcel B was in the City's path of growth. Also, a church located in Parcel B already received fire and water services from the City.

¶39. The chancellor found that Parcel C, the largest parcel, contained the most development, as well as the most vacant land. He found that like Parcel A, Parcel C was adjacent to the City, accessible by existing roads and had on-going development and construction. He noted that both the City's expert and the objectors' experts testified that the parcel was largely in the path of growth.

¶40. Further, the chancellor found that Parcels D and E were in the path of growth of the City as so noted by experts for both the City and the objectors. Additionally, the chancellor took note of the fact that the primary landowner in Parcel E was in favor of annexation.

¶41. The chancellor concluded, "Based on the evidence of past annexations, the growth history of the area, the view, and the totality of the facts stated above, the Court finds the areas are in the City's path of growth."

### c. supporting evidence

¶42. Sellers offered testimony that the PPA was in fact in the path of growth of the City. Sellers testified, inter alia, that the City had made "numerous investments" to upgrade and improve the water system in anticipation of the City's westward expansion, and that "water and sewer" had been provided to the western area.

¶43. The City's expert, Mike Bridge, testified as to path of growth:

> ...clearly, the residential path of growth for the city of Hattiesburg has been in a westerly direction as evidenced by the land use associated with the development that occurred both during and after these annexations. And if you look at the intensity of the development, it becomes very clear that the intensity of development along the Highway 98 corridor drops significantly once you leave the corporate boundaries of the City of Hattiesburg. And that's because of the level of services–the different level of services provided by the City of Hattiesburg versus the unincorporated portion of Lamar County.

### d. conclusion

¶44. As we held in *City of Jackson*, 551 So.2d at 865, and the chancellor wrote in his opinion, the path of growth factor only requires a city to show that the areas desired to be annexed are in "a" path of

growth: "not necessarily the most urgent or even the city's primary path of growth." Hattiesburg has not only shown that this annexation area is in "a" path of growth, but it appears from the record that the PPA may very well be in "the" path of growth of the city of Hattiesburg. There is nothing in the record to indicate the chancellor's findings as to path of growth were unreasonable. There is substantial and credible evidence in the record that, indeed, Hattiesburg is growing in the direction it seeks to annex.

### 3. POTENTIAL HEALTH HAZARDS

*a. the parties' contentions*

¶45. Hattiesburg argues that the evidence on this factor was far stronger than in either the ***Jackson*** or ***Horn Lake*** cases cited by the objectors. The City also points out that the objectors do not argue the chancellor was manifestly wrong in his findings.

¶46. The objectors argue that septic tanks or city sewers all break down eventually, that part of the PPA was already receiving sewer service from the Lamar Park Water and Sewer Association, and that any sewer problems in the area are as much the fault of Hattiesburg as that of Lamar County because of objections by Hattiesburg to Lamar County extending sewer coverage into the area. Finally, the objectors cite Horn Lake for the proposition that "septic tanks are a relatively insignificant factor in the overall reasonableness determination." ***Horn Lake***, 630 So.2d at 20 (citing ***City of Jackson***, 551 So.2d at 866).

*b. the chancellor's findings*

¶47. The chancellor noted the septic tanks to be an "insignificant" factor as so stated in ***Horn Lake***. However, he found that Hattiesburg's sewage and waste disposal system was superior to that of Lamar County. The chancellor noted from the testimony of Jim Weston, Mississippi Department of Health soil

25

and waste disposal expert, that in the PPA there were failing septic systems, badly maintained lagoons, and other unsightly problems that were potentially disease spreading. Weston found that the PPA depended on ground water which can be infected by septic discharge. The chancellor noted that the problems had largely been corrected, but that many of the problems had resurfaced. There were no formal plans or studies by the County to install a sewage system. The chancellor also noted that the city collected garbage twice per week, whereas Lamar County only collected once per week.

### c. supporting evidence

¶48.    With the aid of photographs, Weston testified about potential sewage problems in the PPA. His testimony revealed several "malfunctioning or partially malfunctioning" sewage systems in the PPA, and where Weston did not find "malfunction" he sometimes found "some level of difficulty" with sewage in the PPA. Weston also testified that "[t]he problems would be either slow or backing-up toilets in the facility. And, of course, the main problem would be that, when the field line fails, it would discharge into a storm water drain which doesn't receive any treatment before it enters the environment."

### d. conclusion

¶49.    Weston painted a rather bleak picture of some of the sewage areas in the PPA, especially in his discussion of the potential for disease contamination.

¶50.    The objectors here take somewhat out of context certain language in the *Jackson* annexation case when they argue that the issue of septic tanks was relatively "insignificant" and that in the case sub judice this indicium of reasonableness should not weigh in favor of the City. What we concluded in *Jackson* was that based on the facts and circumstances peculiar to that particular case, the issue of septic tanks was "a relatively insignificant factor in the context of today's overall reasonableness inquiry." 551 So.2d at 866.

26

¶51.	In the end, the chancellor's conclusion on this particular indicium of reasonableness is supported by substantial and credible evidence.

**4. FINANCIAL ABILITY**

*a. the parties' contentions*

¶52.	Hattiesburg believes it can afford to annex; and the objectors, of course, take the opposite view.

*b. the chancellor's findings*

¶53.	"Hattiesburg clearly established its financial ability to support to proposed annex area."

*c. supporting evidence*

¶54.	Even the objectors' witness, Joe David Nichols, chief administrative officer for the City of Biloxi, testified on direct examination that Hattiesburg had the financial ability to perform the annexation. He even went so far as to state that Hattiesburg's proposed sales tax revenue estimate was conservative. Additionally, the City presented documentary evidence via Exhibit H-63 (Services & Facilities Plan), wherein Hattiesburg detailed its revenues and expenditures before and after the annexation. Moreover, the City's financial manager, Joseph Townsend, testified that Hattiesburg "can reasonably expect to meet these financial projections for services in the annexed area." Additionally, Townsend testified that Hattiesburg had the financial ability to meet the annexation costs even without the issuance of bonds.

*d. conclusion*

¶55.	Hattiesburg clearly demonstrated its financial ability to afford the annexation, as evidenced by Exhibit H-63 and the testimony from the city's financial manager. Not only did Hattiesburg's financial manager testify that Hattiesburg could afford the annexation, but likewise, the objectors' expert testified

27

that the City had the financial capability for this annexation. Again, the chancellor's findings on this issue are supported by substantial and credible evidence.

### 5. NEED FOR ZONING AND OVERALL PLANNING

*a. the parties' contentions*

¶56.    The objectors argue that they have a planning department with a full-time staff, as well as subdivision regulations. They cite the Canebrake development (which is not part of the PPA) as an example of the high developmental standards of Lamar County. The objectors also argue that the City can provide no greater services than Lamar County. Not surprisingly, Hattiesburg refutes these assertions by the objectors. The City argues that it can provide more planning services and called the Lamar County planning director adversely as its first witness to show where Lamar County was lacking in this area.

*b. the chancellor's findings*

¶57.    The chancellor found that Hattiesburg "touted" its zoning regulations and building codes and that Lamar County had only "basic" zoning tools. He also found that the County had no building codes. As such, he found this annexation as it relates to this indicium to be reasonable.

*c. supporting evidence*

¶58.    Alana Abney, county planner for Lamar County, was Hattiesburg's first witness. Abney admitted that Lamar County had not adopted an electrical code, a plumbing code, a mechanical code, nor a housing code, and that Lamar County had only adopted a nude dancing ordinance, a hog farm ordinance, a floodplain management ordinance, and subdivision regulations.

*d. conclusion*

¶59.    The chancellor found that the PPA in Lamar County had a need for zoning and planning. The objectors basically point out that there is a planning department within Lamar County, but they failed to

28

show that the chancellor's finding of a need for zoning and planning was not supported by substantial and credible evidence.

### 6. NEED FOR MUNICIPAL SERVICES

*a. the parties' contentions*

¶60.    The objectors argue that the evidence reveals the residents of the county are satisfied with the services already provided by the County.  Hattiesburg asserts that the objectors did not show the chancellor was manifestly wrong as to this indicia of reasonableness.     *b. the chancellor's findings*

¶61.    The chancellor found that the PPA was more like Hattiesburg than Lamar County, that is, more urban than rural.  He cited increased traffic, more commercial developments, the development of a large subdivision, the purchase of land in the area by First Baptist Church, as well as talks of future development, as factors pointing to a need for municipal services.  He also found that the additional police protection the city could provide "can only be an enhancement."  The chancellor correctly noted that this factor focuses on whether city services would "ill benefit" the PPA.

*c. supporting evidence*

¶62.    Charles Sims, Hattiesburg's Chief of Police, testified that the City could provide the PPA police service with existing Hattiesburg City Police personnel.  Sims stated that the Lamar County Sheriff's Department had approximately 500 square miles to patrol with limited personnel, while the Hattiesburg Police Department had only 49 square miles to patrol with "five to six times more personnel and resources" than the Lamar County Sheriff's Department.

¶63.    Chief Sims testified that county roads were the only roads that had an increase in fatalities.  He also testified that the County was not able to run radar to enforce speeding laws.

¶64.    Retired Hattiesburg Fire Chief George Herrington testified that the City proposed to construct a fire station and staff it with twelve persons, four of whom would be assigned to each shift for 24-hour coverage. Funding for the station would be provided from the City's general fun and the municipal rebate fund. Until the station could be built (which would take a year or more), an existing station nearby would be used in the PPA. Lamar County fire coordinator James Smith testified that there were currently two stations in the Northeast Lamar fire district, that the district relied partially on volunteers, and that the district did not currently have a ladder truck.

### d. conclusion

¶65.    The chancellor's finding that the PPA would benefit from city services was supported by substantial and credible evidence.

## 7. NATURAL BARRIERS

¶66.    As noted by the chancellor, the City and the objectors agreed that no natural barriers impacted the reasonableness of the annexation.

## 8. PAST PERFORMANCE TO PRESENT RESIDENTS

### a. the parties' contentions

¶67.    Hattiesburg merely adopted the findings of the chancellor in this regard as its argument. The objectors argue this factor "weighs heavily" against the City; that there are areas in Hattiesburg which have been annexed, some as long as 18 years ago, which have never received city services; and, that some areas of the city, such as the Palmer's Crossing area have only recently gained city services.

### b. the chancellor's findings

¶68.    The chancellor found that "Hattiesburg asserted a good past performance," and noted the continued expansion of sewer service into previously annexed areas, building of fire stations, and improvements to

the police department. The chancellor took note of the objectors' argument that there have been problems in getting portions of the 1991 PPA up to city standards, and that there had been a failure to extend Hattiesburg's "economic boon" to poorer areas of the city. In the end, the chancellor found that "Hattiesburg's past performance has been good and reasonably related to the growth and needs of the area."

### c. supporting evidence

¶69. There is testimony in the record from Emmett Wyman, whose business had been in the city limits since 1982, and who still received water and sewer utilities from Lamar County. He testified that a number of businesses in buildings around him also received water and sewer services from Lamar County although they are within the corporate limits of Hattiesburg. Wyman went into detail as to the efforts he made through the years, to no avail, to be connected to Hattiesburg's water and sewage system.

### d. conclusion

¶70. Of all the indicia, the one in which Hattiesburg is most lacking is that of past performance in the provision of city services to its present residents. During oral argument in the case sub judice, the City's attorney was asked about Hattiesburg's past performance and the time element involved in the City's provision of services to its present residents taken in by prior annexation efforts, and the response from the City's attorney was that "past performance can either be `reasonable' or `miserable,'"and that the record before this Court would reveal that while perhaps somewhat lacking, the City's past performance in its provision of services to other annexed areas was at least "reasonable." When considering the record on this indicium of reasonableness and weighing it against the other strides the City has made, this indicium at the very most weighs slightly against Hattiesburg.

31

¶71. Additionally, no single indicium is dispositive of the overall reasonableness inquiry, as we look to the overall reasonableness of the annexation. The chancellor must consider all of these factors and determine whether under the totality of the circumstances the annexation is reasonable. These factors, however, are only indicia of reasonableness, not separate and distinct tests in and of themselves. *Bassett*, 542 So.2d at 921.

¶72. However, this case represents yet another example of the need to seriously consider previous suggestions made by our colleagues on this Court. Justice Sullivan, in his dissent in *Vicksburg*, and Justice Pittman, in his special concurrence in *Columbus*, proposed a different approach to ascertain "what is reasonable in the annexation process." In *Columbus*, Justice Pittman referred to Justice Sullivan's suggestions in *Vicksburg*:

> I propose that a municipality, in order to go forward with any annexation, must first show by a preponderance of evidence, that it now adequately provides all municipal services to all areas already within municipal limits. If, in a bifurcated trial, the municipality meets this requirement, the city may then proceed to show why annexation is necessary, and exactly what, when and how it will provide services to the area to be annexed.
>
> If this is accomplished, annexation may be granted but the chancellor's judgment must set out a time table for the city to accomplish what it claims it can for the newly annexed area. If, at the end of the period set out in the judgment the protestors can show by a preponderance of the evidence that the city has not provided the promised services, then the chancellor must set the annexation aside.

> *Columbus*, 644 So.2d at 1185, quoting Justice Sullivan in *Vicksburg*, 560 So.2d at 717.

In *Columbus*, Justice Pittman stated further:

> The suggestion of Justice Sullivan began to approach the idea that the Legislature, through its enactments, more fully dealt with the question of annexation than the Court before realized or acknowledged.

32

While the judicially established "indicia" seemed to be a good way to measure the need for annexation and the reasonableness of annexation, this Court has so extended the consideration of "indicia" and the discussion of the indicia to the point that it has become exclusive of other considerations in its application and as stated above, by dissent, often meaningless. It is "unreasonable" for this Court to continue to impose a judicial scheme in the area of annexation while holding annexation is a legislative affair.

While we have written that the question of annexation is legislative and should be dealt with in the legislative forum, we have continuously, through judicial pronouncements, attempted to improve on the statute and we have concluded that the statute failed in its completeness. We have acted as though the Legislature did not act and we created a judicial plan that now is insufficient. We have reached an impasse so that this Court is boxed so that all we can do is affirm the chancellor's findings.

Most of the objections made to the judicial scheme of determining annexation are based on the fact that individual objectors are placed at a tremendous disadvantage to the municipality seeking to annex property of persons not wanting to be annexed. We should not ignore benefits obtained by using the court established indicia; however, we should also recognize that the indicia, created and implemented through court decisions, speak only to the needs of the municipality. The Legislature's scheme gives a more complete consideration to                concerns not only of the municipality but the concerns and the rights of the objectors. In the future, the statutory scheme should be adhered to fully when dealing with annexation.

The indicia of reasonableness place too much emphasis on the effects of annexation on the annexing municipality and little emphasis on those about to be annexed.

*Columbus,* 644 So.2d at 1185.

¶73.     While we may be approaching a need to employ a timetable approach and implementing a

procedural remedy in the nature as discussed by Justice Sullivan and Justice Pittman in *Vicksburg*, and

*Columbus*, respectively, we are satisfied that "the balancing of equity, fairness and determination of what

33

is reasonable in the annexation process" can best be accomplished in today's case by utilizing the well-established indicia of reasonableness.

## 9. SOCIAL AND ECONOMIC IMPACT OF ANNEXATION

¶74.    Lamar County had voted overwhelmingly to remain a dry county, thereby prohibiting the sale of alcoholic beverages.  Since Hattiesburg is wet, this poses what the objectors view as a social impact.[17] The chancellor noted that courts have traditionally been neutral on the issue of alcohol, citing ***Pharr v. State***, 465 So.2d 294, 297 (Miss. 1994).  Moreover, the impacted area will involve 3.6 square miles of the County, and not render all of Lamar County a wet county.   However, this Court is not unmindful of the strong opinions of hard-working, tax-paying citizens who take either a pro-alcohol or anti-alcohol stance when this issue is presented to the citizenry via referendum.  Certainly, in a case such as this, there is the opportunity to express opinions, pro and con, as to the resulting increase in alcohol sales because of the application of the City's ordinances to citizens in the newly annexed territory.  Inasmuch as we are bound by the record, there is nothing in the record which indicates that the chancellor's findings on the social impact of alcohol were not supported by substantial and credible evidence.  As noted by the chancellor on this point,  "[t]he jurisdictional choice of dry or wet was crossed in 1966, after which alcohol sales followed Hattiesburg into Lamar County.  An extension of possible alcohol sales into the proposed annexed area, though certainly against the tenor of the referendum and the passionate objection of witnesses, does not have the same impact as a first crossing."

¶75.    Additionally, the objectors argue that annexation will mean higher taxes for the people living in the PPA.  The chancellor noted that cost/benefits were subjective and impossible to quantify, and that

---

[17]The issue of alcohol was addressed in the chancellor's opinion under Indicium 12 (any other factors, etc.), while the parties' addressed this issue under Indicium 9.

Hattiesburg would provide some services not provided by Lamar County. The chancellor was astute in his analysis when he stated that while Lamar County had an excellent Sheriff's Department, the City of Hattiesburg Police Department, with 1/10 the service area of the Lamar County Sheriff's Department and five or six time more personnel, certainly could provide excellent law enforcement coverage, plus a better fire protection rating in the PPA would result in lower fire insurance premiums, and the PPA would have highly trained professional fire personnel on duty 24 hours a day.

¶76.    The chancellor found that the citizens in the PPA would benefit overall from municipal services. The objectors argue that the annexation would have a negative financial impact on Lamar County and its citizens, due to a loss of $97,000 in tax revenues per year, in addition to lost justice court fines and 911 money. The chancellor noted that the portion of Hattiesburg already in Lamar County accounted for 22 percent of the tax base for the entire county, yet the County did not use 22 percent of its taxes in that area. No balance sheet was provided to the chancellor quantifying the cost/benefit analysis and the chancellor rightfully found this area an impossible one to quantify. Moreover, "the mere fact that residents in the PAA will have to pay more taxes is insufficient to defeat annexation." *In re Enlargement and Extension of Municipal Boundaries of the City of Biloxi*, 744 So.2d 270, 284 (Miss. 1999). Again, the chancellor's findings on this indicium are supported by substantial and credible evidence.

### 10. IMPACT UPON MINORITY VOTING STRENGTH

¶77.    Although the objectors argue that the PPA is predominately white and this would negatively affect the voting strength of minority voters, they offered no proof in support of their argument. Hattiesburg offered exhibits which showed that the non-white racial composition of the citizenry within the existing city

limits was 41.8 percent, contrasted with a 41.6 percent non-white racial composition within the enlarged territory. The white population would rise by .2 percent from 58.2 percent to 58.4 percent. The white voting age population would increase .1 percent to 64.4 percent with the annexation, while non-white voting age population would decrease by .1 percent to 35.6 percent.

¶78. We held in *Matter of Extension of Boundaries of City of Columbus*, 644 So.2d 1168, 1180 (Miss. 1994), that where voting strength is in dispute, we do not afford great weight in cases where the issue is not raised by one with standing. The objectors presented no evidence of dilution nor did they offer any minority objector witnesses aggrieved by such a dilution, and the chancellor so found that the proposed annexation would have "little, if any, effect on minority voting strength." The chancellor's finding on this indicium was not manifestly wrong.

## 11. BENEFITS OF PROXIMITY TO THE CITY

¶79. This indicium focuses on the issue of whether property owners and other inhabitants of the PPA would be able to enjoy the benefits of the city because of the reasonable proximity to its corporate limits without paying their share of taxes. The chancellor found that the growth of the PPA was either "spill-over growth from Hattiesburg, or growth intended to take advantage of Hattiesburg's growth." As the chancellor noted from his thorough and complete assessment of the annexation, "Clearly, Hattiesburg is the economic engine for this region." It appears from the record in this case that if the residents and business owners in the PPA were allowed to continue to remain outside the city limits of Hattiesburg, they would be receiving the City's benefits without paying the taxes for the City's support. Certainly, the chancellor's findings on this indicium are supported by substantial and credible evidence.

## 12. OTHER FACTORS

36

¶80. In addition to alcohol sales,[18] the chancellor also addressed under this indicium, annexation and voting,[19] the concerns, pro and con, of some of the churches in the area, the concerns of certain developers, the "us versus them rivalry" between County and City citizens, and the effect of the annexation on the Oak Grove community.[20] The objectors argue that the community of Oak Grove will lose its "sense of place" if incorporated into Hattiesburg.[21] Hattiesburg argues that it is not unusual for neighborhoods within a municipality to have an identity, and cites the Belhaven neighborhood in the city limits of Jackson as an example. There is no doubt that indeed the Belhaven area of Jackson is unique in its residential characteristics and neighborhood unity. The parties in the case sub judice fervently assert their respective positions as to whether the Oak Grove community's "sense of place," considering the totality of the circumstances, is substantial enough to justify a finding of unreasonableness, insofar as the City's annexation of this community is concerned.

¶81. This Court should certainly not be unmindful of a very common occurrence in Mississippi, that being the unifying effect which a public school has on a community, whether incorporated or unincorporated. It is obvious even from the scant record before this Court regarding the Oak Grove Schools,[22] as well as the

---

[18]As previously noted, while the chancellor addressed alcohol sales under Indicium 12, the parties and this Court have addressed this issue under Indicium 9.

[19]Numerous objectors had voiced concern that they had been unable to vote on the issue of annexation.

[20]The Oak Grove community has been involved in the past in supporting its own incorporation efforts and in opposing Hattiesburg's annexation efforts. *See Incorporation of the City of Oak Grove v. Hattiesburg*, 684 So.2d 1274 (Miss. 1996); *Matter of Enlargement of Corporate Limits of City of Hattiesburg*, 588 So.2d 814 (Miss. 1991).

[21]In his opinion, the chancellor mentioned the Oak Grove Community in addressing both Indicium 9 (Social and Economic Impact of Annexation), as well as Indicium 12 (Other Factors). In their briefs, the parties focused on the effect of annexation on the Oak Grove Community under Indicium 12.

[22]The Oak Grove Schools consist of an elementary school, middle school, and high school.

reported decisions in footnote 20 of this opinion, that the Oak Grove residents have for years had a strong sense of community pride and have been very supportive of their public school in Oak Grove.[23]  Among the witnesses testifying before the chancellor in the case sub judice concerning the Oak Grove community and the Oak Grove Schools were Lamar County Supervisor Mike Backstrom, Melva Maples, Anthony Mozingo, and Thomas Price, who testified that the Oak Grove School was "a central unifier in the Oak Grove area." While the Oak Grove Concerned Citizens were a party in the 1991 **Hattiesburg** decision of this Court, scant if any reference is made to the Oak Grove Schools.  On the other hand, there was at least some discussion of the Oak Grove Schools in the 1996 **Oak Grove** decision of this Court, wherein this Court affirmed the chancellor's decision to approve Hattiesburg's annexation efforts, with one exception, and to disapprove Oak Grove's incorporation efforts.[24]  On the school issue, this Court stated:

> The Lamar County School District has joined in the present appeal based upon the notion that an affirmance of the denial of the incorporation of Oak Grove by this Court will lead to a future annexation of this area by Hattiesburg.  The School District is concerned about such an annexation in light of the *Dupree v. Moore,* 831 F.Supp. 1310 (S.D. Miss. 1993)(*Dupree II)* decision, which would likely cause any annexed areas in Oak Grove to become part of Hattiesburg's school district.  The school district misses the basic point, however, that the present case is not an annexation case at all.  The proper forum to argue about the adverse effect annexation would have on their school district is in an annexation case, when and if Hattiesburg attempts once again to annex this area.....

---

[23]This Court can take judicial notice of the fact that Oak Grove High School, a Class 5A school as so classified by the Mississippi High School Activities Association, which classification is based on high school student population, played Wayne County at Oak Grove on Friday, November 29, 2002, for the South-half 5A football championship.  While football is but one aspect of a public school system, there is no doubt that Oak Grove football is yet another positive factor for the Oak Grove community, drawing the citizens together for a common cause, which, in the end, brings about better working/social relationships among the Oak Grove citizens.

[24]The chancellor had approved Hattiesburg's annexation petition, except for the City's efforts to annex approximately 20 acres of land in Lamar County, which included the community of Oak Grove.  684 So.2d at 1275.  The chancellor's decision was affirmed in toto by this Court. 684 So.2d at 1280.

684 So.2d at 1280.

¶82.    But for the Lamar County School District's reference to the federal district court's decision in *Dupree II,* cited supra, in our 1996 *Oak Grove* case, and our discussion of the effect of annexation on existing schools in *Matter of Enlargement and Extension of the Mun. Boundaries of the City of Jackson*, 691 So.2d 978, 985-88 (Miss. 1997), *infra,* there should be little concern about the future of the Oak Grove Schools in this current annexation litigation.  Miss. Code Ann. § 21-1-59 states in pertinent part:

> Provided further, that any future changes in the boundaries of a presently existing municipality which extends into or further extends into a county other than the county in which the municipality's principal office is located shall not affect the public school district located in the annexed area, unless and until consent thereto shall have first been obtained in writing from the board of trustees of the school district proposed to be partially or wholly included in the change of municipal boundaries.

As noted by this Court in *Western Line Consol. Sch. Dist. v. Greenville Mun. Sch. Dist.*, 433 So.2d at 955-57, this portion of the statute which was amended via 1977 Miss. Laws Ch. 379, clearly provides that a school district (located in a different county than that in which the annexing "municipality's principal office is located") in the proposed area of municipal annexation is unaffected by such annexation "in the absence of written consent of the board of trustees of the adjacent county school district." *Id.* at 957.

¶83.    However, the Lamar County School District's concerns about the federal court decision in *Dupree II*, as set out in our 1996 *Oak Grove* decision appear to be well founded, because a close reading of *Dupree II* calls into question the legality of the 1977 and 1978 amendments to Miss. Code Ann. § 21-1-59, inasmuch as they apparently never received  federal preclearance under section 5 of the

39

Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c. *See **Dupree v. Moore***, 831 F. Supp 1310, 1312.[25]

¶84.    The ***Dupree*** decisions also discuss Miss. Code Ann. §§ 37-7-103 and 37-7-611, and the last pronouncement in the ***Dupree*** line of cases is a one-page order from the United States Supreme Court wherein that Court stated:

> The judgment is vacated and the case is remanded to the United States District Court for the Southern District of Mississippi to clarify whether it has enjoined only Section 47 of the Uniform School Law, 1986 Miss. Gen. Laws Ch. 492, or whether it has also enjoined the effect of Section 52 of the Act (codified as Miss. Code Ann. § 37-7-103 (1972 & Supp. 1990)), insofar as Section 52 implicitly repealed Miss. Code Ann. § 37-7-611 (1972).

514 U.S. 1059, 115 S.Ct. 1684.

¶85.    As noted above, the case before us today is not the first time we have expressed grave concerns over the effect annexation has on existing public schools. In ***Matter of Enlargement and Extension of the Mun. Boundaries of the City of Jackson***, 691 So.2d 978, 985 (Miss. 1997), we stated:

> Of major concern to this Court is the effect on the existing school district boundaries if the annexation were to be affirmed. It is the desire of the residents of the proposed annexation area that their children remain a part of the Hinds County School District. At the time of the trial, the law concerning whether or not an annexed area would automatically be incorporated into the school district of the annexing municipality was in a state of flux and the chancellor dealt with this issue as the law stood at the time of trial. That is, that the boundaries of the school districts would not

---

[25]*See also**Moore v. Dupree***, 514 U.S. 1059, 115 S.Ct. 1684, 131 L.Ed.2d 550 (1995);***Lamar County Bd. of Educ. and Trustees v. Dupree***, 514 U.S. 1059, 115 S.Ct. 1684, 131 L.Ed.2d 550 (1995); ***Lamar County Bd. of Educ.***, 114 S.Ct. 872, 127 L.Ed.2d 69 (1994); ***Moore v. Dupree***, 510 U.S. 1068, 114 S.Ct. 872, 127 L.Ed.2d 69 (1994);***Dupree v. Moore***, 503 U.S. 930, 112 S.Ct. 1462, 117 L.Ed.2d 609 (1992); ***Dupree v. Mabus***, 776 F. Supp. 290 (S.D. Miss. 1991) (***Dupree I***).

automatically change. There have been some major developments in this area since the final judgment in this case was rendered.[26]

691 So.2d at 985.

¶86. The 1997 *Jackson* case involved the City of Jackson's efforts to annex a certain area south and southwest of Jackson's existing corporate limits, including most of the unincorporated community of Byram. The chancellor had granted Jackson's annexation petition, and this Court reversed and rendered the chancellor's decision, finding, inter alia, that the Jackson's efforts amounted to a "tax grab," with its "primary motivation for the proposed annexation [being] to expand its tax base." 691 So.2d at 983. However, as noted, *supra*, this Court in *Jackson* expressed its concern over the effect of annexation on existing schools, and in so doing, this Court devoted approximately three pages in its reported opinion discussing the school issue, citing basically the same statutes, citing the same state and federal cases, and arriving at basically the same conclusion as this Court does today – there is still uncertainty as to the effect of annexation on existing schools or school districts. Admittedly, in *Jackson*, there was no issue of students crossing county lines to attend school, but instead, the issue was whether approximately 1200 students in the Hinds County School District would attend the schools within the Jackson Public School District (JPSD). On the other hand, in the case before us today, the question is whether Hattiesburg's annexation of the Oak Grove area would result in students who are currently attending the Oak Grove schools (a part of the Lamar County School District) to instead attend schools within the Hattiesburg Municipal School District (Hattiesburg, of course, being the county seat of Forrest County).

¶87. Quite frankly, because of our genuine concern over the school issue, we have devoted considerably more space in this opinion to the school issue than have the parties. The parties' briefs reveal only a scant

---

[26]The final judgment in the *Jackson* case was rendered June 4, 1993.

41

reference to the Oak Grove community, much less the Oak Grove schools. The objectors' devote 8 lines of their brief to the Oak Grove community, but only 2 lines to the schools, when they state that the Oak Grove community "gravitates around the Oak Grove Schools but is very important to the residents of that community." The City, understandably, makes no reference in its brief to the school issue, and devotes only 4 lines to the Oak Grove Community. Neither Oak Grove community nor the schools are mentioned in the objectors' reply brief. As noted, *supra*, very little testimony was offered on the school issue. On the other hand, in *Jackson*, considerable evidence was offered on the effect of annexation on the Byram area students and whether the JPSD could accommodate the Byram area students should annexation occur; and, also this issue was thoroughly briefed by the parties.

¶88.    In the case before us today, the chancellor, in addressing Indicium 9 (Social and Economic Impact of Annexation), found that certainly Oak Grove had grown over the years, and further referred to our 1991 *Hattiesburg* decision which stated in pertinent part:

> They [the affected Lamar County residents] wanted to maintain their rural lifestyle. They liked living in the area because the people were friendly, there was a good school close by and there was a sense of community among the residents. Some feared that if the area were annexed, they would lose their sense of community and identity.

588 So.2d at 826. The chancellor went on to hold that while this rural description could certainly apply to the Oak Grove community, "[i]t does not describe the various parcels of the PPA which are heavily commercial and quickly urbanizing at the edges," and "[t]he intangibles, such as belonging to a vibrant municipality or belonging to a sentimental rural community, are too great and too subjective." In addressing Indicium 12 (Other Factors), as it related to the Oak Grove community, the chancellor noted that our 1996 decision in *Oak Grove*, and our 1991 decision on *Hattiesburg*, "effectively negate any future Oak

42

Grove incorporation" and that the record before him revealed no "current plans [by Oak Grove] to incorporate."

¶89.    In the end, as in any case, we are bound by the record and as already noted, the chancellor's findings as to the reasonableness of the annexation may only be reversed if the chancellor's decision is manifestly wrong and not supported by substantial evidence. Accordingly, on the Oak Grove issue, we are constrained, as a matter of law, and based on the record before us, to affirm the chancellor on this issue as well.

## IV.    WHETHER MISS. CODE ANN. § 21-1-27 IS CONSTITUTIONAL?

¶90.    The objectors argue that Miss. Code Ann. § 21-1-27, the annexation statute, is unconstitutionally vague, and that the "reasonableness" standard is "elusive, nebulous, defies definition and gives no guidance to the opponents or proponents of annexation." However, the annexation statute merely provides for the procedures a city must undertake to annex property. What the objectors attempt to do here is have this Court become a super-legislature and strike down this statute as unconstitutional, reversing countless cases and calling into question the boundaries of most of the municipalities of the state. This, the Court refuses to do.

¶91.    While the "reasonableness" test is no doubt malleable, it is what this Court has interpreted the statute to provide. So it is a logical impossibility to argue the statute is unconstitutional because of the "reasonableness" test, when the "reasonableness" test is not found in the statute, but instead is a creature of the judiciary. The statute is not unconstitutionally vague. This Court's interpretation of it may allow for ease of annexation, but if the objectors wish to make the "reasonableness" test less "nebulous," as they put it, the Mississippi Legislature is the proper avenue for so doing. The allegation by the objectors that this annexation is merely a "taking without the due process of law" is without merit. The basis for this assertion

43

is the sufficiency of the statutory notice required pursuant to Miss. Code Ann. § 21-1-31. The record reveals that the chancellor was cautious in assuring more than minimum notice to those citizens affected by Hattiesburg's annexation efforts. The record reveals that there were multiple notices placed on numerous occasions within the PPA, as well as the Hattiesburg newspaper. In the chancellor's order of June 22, 2000, there were provisions that a re-notice should occur by re-posting notices of the pending annexation petition and impending trial date "in three places in each of the five non-contiguous parcels sought to be annexed." Pursuant to the chancellor's order, notice was filed on November 6, 2000, that a hearing would take place on the corrected petitions on February 5, 2001. Notice of Posting of the corrected petition was filed on November 29, 2000 by Charlie Sims, Hattiesburg Chief of Police. Notice was also placed in the Hattiesburg *American* newspaper to run for four weeks, November 8-29, 2000. Moreover, the objectors have shown nothing being "taken." The eleventh indicium of reasonableness, the "fair share" indicium, provides a succinct summary of this case. Hattiesburg merely attempts to have everyone pay their fair share from the benefits the City provides. The City is simply growing into the PPA and, except for the one noted exception, the Court finds nothing unreasonable in the chancellor's granting of the petition for annexation.

## CONCLUSION

¶92. Annexation litigation quite often, and quite understandably, arouses the emotions of the affected citizens. However, our limited scope of judicial review and our well-established case law have guided us to the conclusion we reach today. Accordingly, we find that the special chancellor did not err in allowing the city to amend its legal description of the area proposed for annexation, nor was there error in not dismissing the case at trial. Additionally, it was the duty of the special chancellor to thoroughly study and consider the reasonableness of the annexation as proposed by the City of Hattiesburg. To this end, the

44

chancellor conducted a 12-day hearing which generated voluminous testimony from witnesses and numerous exhibits, which involved a personal inspection by the chancellor of all affected areas, and which resulted in the entry of a 31-page opinion followed by the entry of a 16-page final judgment consistent with the opinion. The chancellor's findings of reasonableness as to the annexation of the areas within the PPA were supported by substantial and credible evidence. Finally, Miss. Code Ann. § 21-1-27 is not unconstitutional. For these reasons, the trial court's judgment is affirmed in all respects.

¶93. **AFFIRMED.**

**SMITH, P.J., WALLER, DIAZ AND GRAVES, JJ., CONCUR. COBB, J., CONCURS IN RESULT ONLY. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. McRAE, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION. PITTMAN, C.J., NOT PARTICIPATING.**

**McRAE, PRESIDING JUSTICE, CONCURRING IN RESULT ONLY:**

¶94. I concur in the result reached by the majority. The majority has again usurped the power of the Legislature and boxed itself into making annexation decisions which our Constitution reserves for the Legislature. Additionally, this mater has been entrusted to the subjective mind of the chancellor hearing the proceeding.

¶95. The State Constitution grants the Legislature the power to establish and alter municipal boundaries through its incorporation power. Article 4, Section 88 of our Mississippi Constitution (1890) provides:

> The legislature shall pass general laws, under which local and private interest shall be provided for and protected, and **under which cities and towns may be chartered and their <u>charters amended</u>, and under which corporations may be created, organized, and their <u>acts of incorporation altered</u>.**

(emphasis added). The Constitution makes it clear that issues regarding annexation are "within the ambit of the legislature and not this Court." *In re Extension of the Boundaries of City of Batesville*, 760 So.2d 697, 708 (Miss. 2000) (McRae, J., dissenting). *See In re Enlargement and Extension of Mun. Boundaries of City of Madison*, 650 So.2d 490, 509 (Miss. 1995) (McRae, J., dissenting); *In re Extension of Boundaries of City of Jackson*, 551 So.2d 861, 863 (Miss. 1989).

¶96. Furthermore, the Legislature is more equipped to handle the delicate balancing required when reviewing annexation challenges, since its members are more in touch with their communities needs. "The Legislature acts out of concern with what is best for the overall community, not as the courts do, applying legal standards, evidentiary rules and deciding for a particular party." *In re Enlargement of the Corporate Limits of the City of Hattiesburg*, 588 So.2d 814, 836 (Miss. 1991) (Robertson, J., concurring in part and dissenting in part). *See Marshall v. Mayor and Board of Selectmen of City of McComb*, 251 Miss. 750, 171 So.2d 347, 348 (1965). "It is incumbent upon the legislative branch to take annexation under its belt in order to give affected people a representative voice." *City of Batesville*, 760 So.2d at 710 (McRae, J., dissenting).

¶97. Additionally, this Court has allowed annexation decisions to become the decisions of subjective chancellors. By creating the "twelve indicia of reasonableness," this Court has allowed a chancellor to decide issues of annexation subjectively and support such decisions by the insertion of one simple sentence of support per indicium within his opinion. Basically, the decision comes down to the philosophy of the chancellor and his subjective view on the issue of annexation. Traditionally, this Court affirms these decisions based on the insertion of these few supporting sentences. This is not what our Constitution

intended. The citizens of the communities affected by the annexation are better equipped to determine the need and effects of the proposed annexation through our State's legislative process.

¶98.     We are not Caesar and should not attempt to function like a Caesar.   "Unless this Court leaves annexation to legislative action, there will be thorns in the state judicial system's side forever . . . . " *Id*. Accordingly, I concur in result only.